**UNITED STATES DISTRICT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cr-00444-JEB** |
| | ) | |
| **BRIAN MOCK,** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**<u>DEFENDANT'S MOTION FOR RECONSIDERATION OF DETENTION</u>**
**<u>ORDER</u>**

William L. Shipley, Jr., Esq.
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*

1

## INTRODUCTION

Defendant BRIAN CHRISTOPHER MOCK ("Mr. Mock"), by and through his counsel of record, respectfully moves this Honorable Court to reconsider the Detention Order that Chief Judge Beryl Howell entered in the District of Columbia on June 29, 2021, and affirmed by this Court on January 26, 2022, in response to Mr. Mock's *pro se* motion to reconsider same.

This motion does not challenge the conclusions of either Judge Howell or this Court.  Rather, this motion reveals to this Court for the first-time misstatements made by the Government about its evidence as part of its moving papers and proffer that resulted in the Orders by Judge Howell and this Court. These misstatements are based, in part, on evidence the Government possessed but didn't bring forward in either prior hearing notwithstanding the fact that the evidence was relevant to issues squarely presented in the earlier detention proceedings.

While the previous conclusions of Judge Howell and this Court might have been supported by the view of the selective presentation of evidence made as part of the Government's proffer, scrutiny of the discovery by current counsel has revealed material inaccuracies in the claims made by the Government that were the foundation for conclusions reached by the Court in favor of the Government's motion to detain Mr. Mock pending trial.  Had the Government not misled the

Court on factual matters that both Judge Howell and this Court found to be critical in the decision to detain Mr. Mock, from the language of both Court decisions it is very likely he would have been released on conditions and terms of pretrial release pending trial.

It is not a matter of the Court's analysis being mistaken – it's a matter of the Court's analysis having being corrupted by inaccurate and/or incomplete information supplied by the Government when the Government knew or should have known it was omitting relevant and material evidence.

This Court should release Mr. Mock from custody while he awaits his trial. Mr. Mock's release is proper because there exists a combination of conditions that reasonably assure his appearance at this Court's request(s) and these conditions reasonably assure the safety of any other person(s) and the community.

## LEGAL STANDARD

To determine if pretrial detention is appropriate, courts consider four statutory factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Munchel*, 991 F.3d 1273, 1279-80 (D.C. Cir.  2021). But, as the Circuit Court cautioned in that case:

"A defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."

Mr. Mock acknowledges that a motion for reconsideration of a detention order already entered may proceed only upon the fulfillment of certain conditions. Title 18 U.S.C. § 3142(f)(2) allows a Court to reopen a detention hearing at any time before trial only if information is presented that was not known to the defendant at the time of the earlier hearing, and that new information has a material bearing on the decision previously made.

## ARGUMENT

In this Court's Order dated January 26, 2022, it found there was no basis in the record, as presented by Mr. Mock in his *pro se* capacity, to disagree with the findings set forth in Presiding Judge Howell's decision to detain him on June 29, 2021.  That Order quoted Presiding Judge Howell near the end as follows:

The nature and seriousness of the danger to the community posed by the defendant's release also weigh in favor of detention. Defendant was part of the mob attack on the Capitol in which many people, including police officers, were injured — some fatally —and Congress's constitutional task of counting electoral college votes was disrupted and delayed. Defendant's 2011 charge and the circumstances surrounding that incident, his willingness to attack two different police officers with his bare hands, his brazen lack of remorse for his actions and his disturbing attempts to intimidate his ex-girlfriend into concealing evidence of his conduct, taken together, amplify concern that defendant risks obstruction and that no condition or conditions will assure the safety of the community and potential witnesses, if he were to be released.

(Emphasis added.)

The Government argued to Presiding Judge Howell, and she agreed, that the combination of three distinct factors justified the determination that Mr. Mock should be detained pending trial: 1) He engaged in violent conduct against two different law enforcement officers; 2) He had a prior history of violence which resulted in a felony conviction in Minnesota approximately 11 years earlier; and 3) He engaged in potentially obstructive conduct alleged to be threatening and harassing his ex-girlfriend in an effort to silence her prior to his arrest, and this conduct which bore some similarities to allegations made against him in his earlier conviction in Minnesota.

Presiding Judge Howell found that none of the three factors, if standing alone, would have justified detaining the Defendant.  But the combination of the three was such that she determined there were no conditions or combination of conditions that could reasonably assure the safety of the community.

But the findings by Presiding Judge Howell on these three subjects were misinformed by misstatements in the Government's proffer, and the decision by the Government to not put before Presiding Judge Howell information that only the Government knew at the time of the hearing.

Defendant Mock addresses each finding out of order as set forth below:

1.    Whether Defendant Mock committed potentially obstructive conduct and/or attempted to intimidate a government witness.

Defendant Mock traveled from Minnesota to Washington DC by car with two companions – his girlfriend at the time ("MV"), and a male friend from Montana ("CF").

FBI Special Agent Beth Alvaraez interviewed MV by telephone on June 11, 2021, five days before the Government filed its Emergency Motion for Review of the Minnesota Magistrate's decision to release Mr. Mock pending trial.  The FBI 302 of the interview is dated as having been indexed in the FBI case file on June 14 – two days before the Government's Emergency filing.  A copy of the 302 is attached to the Declaration of William L. Shipley, marked as Exhibit "A", which is filed in support of this motion.

The following passages are verbatim quotes taken from SA Alvarez's 302 memorializing her interview of MV:

> [MV] has seen the photographs online of Mock assaulting officers.  She was not present when that happened and did not see him do it.
>
> Mock and [MV] are no longer a couple.  [MV] wanted to reach out to the FBI to provide information, but did not know how.
>
> Mock told her he would "make it bad" for her if she provided information to the FBI.  [MV] perceived this as a threat.
>
> About two years ago, she was in a bad car accident that caused her to have a seizure condition.
>
> [MV] met Mock at the end of November 2020 and they broke up in approximately April 2021.

[MV] did not want to go to the protest, but Mock convinced her to.

She is not sure where she was when Mock was assaulting the officers as seen in the online photographs she saw.

[MV] has since deleted the videos from her phone because she wanted to erase all memories of that day.

During the riots, [MV] kept getting separated from Mock, but then he would find her and pull her along with him.

As Mock and [MV] were exiting the Capitol grounds … Mock was yelling at the officers, "spewing anger" and saying things like "Do you feel like a man now?" and "Do you feel like you are protecting anyone?"

After the breakup, Mock showed up at her house on two occasions, one in April and then on or about May 16, 2021.  The purpose of the May 16 visit was to drop off some of her clothes that she left at his house.  He went inside her open garage and stayed there for some time.  Mock was in the garage and [MV] was inside the house with the door locked.  Mock spoke to [MV] through the door …. [MV] was almost to the point of calling the police; however she called [CF] and told him that he needed to get Mock under control.  [CF] was able to convince Mock to leave [MV's] garage.

[In a phone call Mock] told her about the photographs of him at the Capitol riots that were online.  He said something like "I'm warning you, they are going to be after you too, and if you are the one that tipped them off you're going to do down with me."  [Emphasis added]

He told her not to call anyone about the photographs and not to tell anyone, or he would make her life hell.

He told her something like she needed to be on the "honors system" and not call the FBI.

[MV] wanted to call the FBI but was not sure who to tell.

… she would be "slightly intimidated" if Mock were to be released from jail.

The Government used many of these comments in its Emergency Motion filed on June 16, 2021.  But the manner in which the Government made use of MV's comments to SA Alvarez either mis-stated facts in material ways, omitted material passages that undermined the proffered factual claims, and/or mischaracterized them through a lack of care for context or accuracy.

a.    MV's Value as a Witness.

According to SA Alvarez's 302, MV twice said that she did not witness the two assaults that are alleged in the Superseding Indictment -- the two most serious felonies that Mr. Mock is charged with.  That fact is not mentioned anywhere in the Emergency Motion by the Government wherein it claimed that Mr. Mock was a potential threat to obstruct a key government witness against him.

In addition, MV told SA Alvarez that she had been in a serious automobile accident approximately two years earlier and suffered from a "seizure disorder" as a result.  Mr. Mock raised this issue orally before this Court – telling the Court that MV's injuries from that accident resulted in cognitive impairments that impact her ability to recall and recollect events.  But the Government remained silent on the subject, leaving this Court to conclude MV was "credible" in her recounting of alleged "threats" made to her by Mr. Mock.  The Government knew from the interview there might be medical issues that could make MV a less credible witness, but the Government did not disclose that information to the Court.

      b.     MV Admitted Mock Was Not The Reason She Failed to
<u>Contact the FBI.</u>

Presiding Judge Howell's Order includes an observation that MV's failure to contact the FBI prior to Mr. Mock's arrest <u>might have been</u>, in some way, the product of the alleged threats by Mr. Mock.

> The ex-girlfriend's decisions not to seek an order of protection ***or to furnish law enforcement with the information about the defendant until after defendant was arrested on June 11, 2021 can also be viewed as defendant's threats effectively giving his ex-girlfriend a credible fear of informing on him***, particularly since she reported that defendant "showed up unannounced at her house more than once and harassed her after their breakup."

Attachment to Order of Detention, p. 4.  Presiding Judge Howell cited and quoted from the Government's Emergency Motion as support for this supposition.

The Government never disclosed that MV said she wanted to contact the FBI but her reason for failing to do so was because "<u>she was not sure who to call.</u>" This is reflected <u>twice</u> in the 302.  There is no support for the conclusion that MV failed to contact the FBI due to alleged threats supposedly made by Mr. Mock.

This is a second instance of the Government failing to disclose factual information that contradicted its proffer regarding MV as a witness.

      c.     MV Made Material Misstatements to the FBI and Admitted to
<u>Engaging in Potentially Obstructive Conduct of Her Own</u>.

MV told the FBI that she was a reluctant participant in the January 6 protests, and that she only went along because Mr. Mock continually urged her to

go with him.  She claimed that she stayed near the back of the crowd, took videos, and only went forward when Mr. Mock brought her forward with him.

But Mr. Mock and MV were not alone at the January 6 protests – they were accompanied on the roundtrip by CF.  Filed in support of this Motion is a Declaration from CF, in which he states:

> I was never in favor of [MV] coming on this trip.  It wasn't my intention to go w/anyone but Brian M.  I didn't know anything about her before we went to D.C.  I was never comfortable around her and quite frankly I'd say she is scary.
>
> Her mental state was quite bizarre. The things I witnessed going to D.C. and back to MN led me to end all contact w/her while trying not to upset her.
>
> She made lots of scary comments that I took just as someone venting.
>
> From what I know she has medical issues that she neglected to have treated and I witnessed how it caused her to act.
>
> She spent the entire trip back to MN posting online on her and Brian's phones as Brian drove the entire trip.
>
> … seeing a woman down an entire bottle of Montana rye whiskey in one night is not pleasant.
>
> I went home to Montana after that.  Brian stood by her and tried his best to help her….
>
> I remember texting with both of them on a day when Brian was trying to simply get his belongings and leave [MV's] apartment…. I tried to keep her calm.  She had no desire to let it end peacefully.  I felt as if she was trying to get Brian in trouble that day.  I hope she seeks help for her issues.  Nobody should live that way.

The FBI 302 of MV"s interview states that MV admitted she took videos during the J6 protests using her phone and she later deleted those videos.  The Government says nothing about MV's admitted obstructive conduct while claiming it is Mr. Mock who in a threat to obstruct justice in order to get him detained.

Finally, CF's description of MV's behavior and attitude on the trip is at odds with MV's description of herself as a reluctant participant.

All this information would have called MV's credibility into question had it be disclosed to the Court as part of her claims she was "threated" by Mr. Mock.

      d.    The alleged incidents of Mr. Mock "threatening" and/or "harrassing" MV were mis-stated by the Government.

The Government's Emergency Motion included noteworthy failures to accurately state and factually distinguish the separate "threatening" or "intimidating" comments allegedly made by Mr. Mock to MV as described by MV during her FBI interview.

The Government's Motoin emphasized that Mr. Mock made the following alleged comments to intimidate and/or harass MV for the purpose of discouraging her from cooperating with law enforcement:

       1) that Mr. Mock said he would "make it bad" for her if she provided information to the FBI;

       2) that Mr. Mock said to her "I'm warning you, they are going to be after you too…."; and

3) That Mr. Mock said he would "make her life hell."

As for the first comment, SA Alvarez's 302 links this alleged comment by Mr. Mock – which he denies making – to a claim that he was attempting to dissuade her from providing information to the FBI.

The second comment, while written in the 302 as a quote attributed to Mr. Mock, in actually in sentence where the quoted language comes after the sentence begins "*He said something like….*"

There is no certainty that SA Alvarez is quoting Mr. Mock because MV didn't represent that she was quoting Mr. Mock.

Regardless of whether the words were MV's, SA Alvarez, or Mr. Mock, the context of the comment as did not involve MV cooperating with the FBI against Mr. Mock.  The context was Mr. Mock pointing out to MV that she would likely be an FBI target herself because they were together.  He was not persuading her against contacting the FBI for his benefit, his advice was for her to look out for herself -- "they are going to be after you too."  MV told the SA Alvarez that her failure to contact the FBI was because "she didn't know who to call", not because Mr. Mock prevailed upon her to not call.

The third comment – set forth in the 302 in a different manner than used by by the Government in its filings – isn't even a reference to the FBI or other law enforcement.  Mr. Mock denies making the comment, but even the way it is reported in the FBI 302 indicates it was not about talking to the FBI, but rather

about telling anyone – friends, family, etc., -- that their pictures were posted on the FBI's website.

But also noteworthy with respect to this particular alleged comment is that in the FBI 302 SA Alvarez does not claim that the words "make her life hell" were words spoken by Mr. Mock as reported by MV.

There are several instances in the 302 where SA Alvarez used quotation marks to specify words that were specifically attributed to Mr. Mock by MV. But SA Alvarez did not do use quotation marks around the "make her life hell" phrase the only time those words appear in the 302.

Yet those four words – written in quotation markses attributing them to Mr. Mock – play an outsized role in the Government's arguments about obstruction by Mr. Mock, and in both Opinions of this Court -- Judge Howell's initial opinion, and this Court's opinion affirming Judge Howell's detention order.

The Government's Emergency Motion (ECF No. 6) did not put the phrase "make her life hell" in a quotation attributed to Mr. Mock. But in its Reply, the Government used the phrase as a quotation for the first time:

> Mock threatened the woman who went with him to the Capitol and told her he would "make her life hell" if she identified him to law enforcement.
>
> ECF Doc. No. 13, p. 4.[1]

---

[1] Not only is that a quote manufactured by the Government, the Reply used it in the wrong context as that alleged statement as reflected in the SA Alvarez 302 concerned MV telling friends or family about their pictures being on the FBI website – not about cooperating with the law enforcement.

Presiding Judge Howell's Order adopted this Government misstatement of evidence when she wrote "Defendant, upon seeing publicly posted FBI photos of himself, warned this ex-girlfriend that he would … "make her life hell" if she provided any information to the FBI."  Howell Order, ECF Doc. No. 20, p. 3.

Did MV claim Mr. Mock said those words or did SA Alvarez paraphrase and condense MV statements down to that inflammatory phrase?  Mr. Mock denies every saying to MV that he would "make her life hell."  The FBI 302 does not reflect that MV claimed Mr. Mock used that inflammatory phrase.

This is the record made by the Government before Judge Howell, and it is another instance where there is a failure of proof with regard to the Government's claims about what the EVIDENCE would be.

> e.     Concerns about "unannounced visits" by Mock to MV are also <u>the result of Government misstatement of evidence known to it</u>.

As is clearly stated in SA Alvarez's 302,  MV claimed there were <u>TWO</u> supposedly "unannounced" visits by Mr. Mock to MV's residence in the period after their relationship ended in April 2021.

MV told SA Alvarez the first visit was in April 2021 after they broke up, but provided no further details.  She did not claim in any way that this "unannounced visit" included any threats or intimidation by Mr. Mock related to January 6 or otherwise.

MV told SA Alvarez that the second visit in May 2021.  Her basic description was that Mr. Mock came to her residence to drop off her personal belongings that had been at his house, and to pick up his personal belongings that were at her residence.  During the course of this visit – announced or otherwise – there was a disagreement, and she relied upon calls to CF to get Mr. Mock to leave.

1. The April 2021 "Visit":

MV did not provide any details to SA Alvarez regarding events in April.

Attached to the declaration of William L. Shipley, filed in support of this Motion, marked as Exhibit "C", is an Incident Report from the Police Department of Eagan, Minnesota.  The report concerns an April 27, 2021, "welfare check" on a MV at her residence located Eagan.  The "Reporting Person" is listed as Brian Mock.  This Report reflects what MV recalls as an "unannounced visit" by Mr. Mock in April 2021 after they broke up.  Mr. Mock did not visit – he asked the police to visit and check on her well-being.

The Officer's Narrative states that after being dispatched he contacted Mr. Mock by telephone.  Mr. Mock told him that MV was his ex-girlfriend and that she suffers from some mental health challenges.  Mock described a recent incident involving a possible overdose of a prescription medication based on what MV had told him – Mr. Mock had not witnessed what she claimed she had done.  Mr. Mock told the Officer that MV called him earlier in the evening on April 27, and that she

was "rambling on" and "not making very much sense." That led him to call the police.

The Officer's narrative states that they went to the residence, that MV allowed the officers to enter her house, that she had been drinking but claimed she had not taken any pills that night and did not need any police assistance. The Officer wrote "I advised her the reason we were there is that Brian was concerned for her welfare, and she stated that was fine." The Officer noted that MV had been drinking inside her own residence, and appeared to be able to care for herself. The Officers then departed. The Officer communicated his findings to Mr. Mock by telephone, and the matter was concluded.

That was the first "unannounced visit" supposedly made by Mr. Mock according to MV. In fact, he never went to her house.

It also runs contrary to the Government's claim that Mr. Mock tried to prevent her from coming in contact with law enforcement after January 6 – he sent law enforcement to check on her wellbeing.

## 2.   The May 16, 2021 Visit

MV described this event to SA Alvarez.[2] Nothing about the event was unanticipated, and the only "unannounced" aspect may have been the exact time of

---

[2] Mr. Mock agrees there was a visit in the fashion described. But Mr. Mock's recollection is that this visit was in March, 2021, not May 2021. The "basics" of the visit are the same.

Mr. Mock's arrival.  But MV was expecting him to come to her house in order to exchange personal belongings after their relationship ended.

MV's description claimed that Mr. Mock stayed in her garage and refused to leave, that she had to threaten to call the police, as well as involving CF by telephone in order for him to convince Mr. Mock to leave.  But she also describes him as calm – not agitated – and they talked back and forth through a closed door.

MV and CF's accounts are also similar, but diverge with regard to the circumstances of Defendant Mock's departure.  MV claims she called CF to tell him to get Mock under control, and for CF to tell Mock to leave her garage.

CF states in his Declaration that he was in contact with both by text message – not speaking on the telephone -- and that he was trying to keep MV calm during the event.  CF stated that it was MV who was determined to not let matters end peacefully between her and Mr. Mock, and that CF stated that he believed she was trying to get Mr. Mock in trouble that day by her conduct.

The Government has relied heavily on the claim by MV that there were supposedly "unannounced visits" by Mr. Mock that were threatening and harassing.  But the Government never acknowledged to this Court that it had no facts about the first supposed visit – MV didn't remember them -- and it made no effort to contact CF about the events of the other visit even though MV told SA Alvarez about CF being involved.

Instead, the Government engaged in fact-free hyperbole by making a conclusory claim that in its Emergency Motion that  "Mock also showed up unannounced at her house <u>more than once</u> and harassed her after their breakup." Emergency Motion, ECF No. 6, p. 11. [Emphasis added].

Two is "more than once", but rather than be forthright about the actual episodes, and MV's descriptions, the Government used unduly suggestive language not supported by facts it did know create a false impression about those two visits.

A welfare check by local police cannot be considered "harassing" so the Government's proffer is now down to only one episode.

CF's statement with regard to MV's attitude and conduct during the March or May visit seriously undermines the proffer with regard to there having being "threats" or "intimidation" by Mock towards MV.

The Government allowed Presiding Judge Howell to mistakenly believe that the "unannounced" visits were "harassing" and "intimidating" in nature, and as such were predictors – or "red flags" as Presiding Judge Howell called them – of possible future obstructive efforts by Mr. Mock.   '

That might have been true if the Government's descriptions had been accurate – but they were not.

But the Government needed to hype those allegations that to be part of its argument to keep Mr. Mock's detained, and as a basis for the Court to conclude

that there was a specifically articulable future risk of Mr. Mock threatening or otherwise inappropriately seeking to influence MV.

Now that the record is more fully developed – in significant part by bringing forth evidence the Government had but did not produce to Judge Howell Court -- there is no longer a basis for the finding that two "unannounced visits" by Mr. Mock were cause to fear inappropriate future conduct because neither of the "unannounced visits" actually involved inappropriate conduct by Mr. Mock.[3]

2.      Whether Defendant Mock Engaged in Violent Conduct Against Two Different Federal Law Enforcement Officers.

There are two episodes at issue, each of which is charged as a separate count of assault in violation of 18 U.S.C. § 111.  The first incident takes place shortly before 2:30 pm and the second incident takes place shortly before after 2:34 pm.  The still images in the Government's Emergency Motion are taken from two different Body Worn Cameras.

The video for the first incident has an identifier of X6039BEWQ.  (Video 1)

The video for episode two has an identifier of X6039BJJA.  (Video 2)

a.  Video 1

---

[3] If the Government seeks to go back to MV now for further information on these two episodes, it is now on notice from three different sources – MV, Mr. Mock and CF – that she suffered serious traumatic brain injury in the automobile accident she told the FBI about, and it is incumbent upon the Government to advise this Court with regard to what impact that has on her ability to perceive and recollect events.  Those issues go to her reliability as a hearsay declarant.

The Government has not identified Victim One in connection with the first incident. It will have no evidence to present at trial in the form of testimony from the Victim as to the first incident.

Both the Government and the Court – both this Court and Presiding Judge Howell – have acknowledged that Video 1 does not show any actual assault by Defendant Mock as alleged in the indictment.

Judge Howell cites to the Affidavit of SA Alvarez filed in support of the Criminal Complaint, which included still images taken from Video 1. But even artful drafting can't hide the fact that Judge Howell recognized that Video 1 doesn't show Mr. Mock kicking the Officer while he was on the ground.

> "[B]ased on screenshots … showing defendant with a raised knee and eyes on the fallen officer…"

ECF Doc. No. 6, p. 6.

If Video 1 showed Mr. Mock kicking the fallen officer it would have been simple to write "The video shows Mr. Mock kicking the fallen officer." Judge Howell didn't write that because the Video 1 doesn't show that. The Government knows it, Mr. Mock knows it, and Judge Howell knew it.

This Court expressed a similar recognition when it referred to the Government's video evidence as "not pellucid". ECF Doc. No. 40, p. 4.

The Government's burden of proof when establishing "dangerousness" on the part of the defendant is "clear and convincing." Evidence that is "not

pellucid" seems far from the mark of the Government satisfying the "clear and convincing" standard of proof.

The simple reality is that Video 1 shows the unidentified Victim Officer already on the ground when Mr. Mock is first seen on camera.  There are two other protesters – one wearing camouflage and the other wearing a red hat  -- on the ground with the Victim Officer at the moment Defendant Mock is first seen. Defendant Mock is standing in close proximity to the three of them.  He is not seen shoving the fallen officer to the ground.

The entire segment of Video 1 relevant to the first alleged assault lasts only four seconds.  At no point in those four seconds does Video 1 show how the Victim Officer came to be on the ground.  At no point in the four seconds does Video 1 show Defendant Mock's hands on that Officer.  At no point in the four seconds does Video 1 show Defendant Mock's foot making contact with any part of the Officer's body.

Nevertheless, the Government made a proffer in its Emergency Motion that the video showed Defendant Mock shoving the Officer to the ground and then kicking the Officer.

As noted above, the Government relied heavily on a single screen shot from the video that appears to show Defendant Mock's right foot off the ground.

If the Government had video of Mr. Mock's right foot striking the Victim Officer, it is quite certain it would have included a screenshot of that particular

moment instead of the one it choose.  The obvious conclusion is the Government

has no such video.  It hasn't produced one in discovery.

There is no EVIDENCE that Defendant Mock pushed the first Officer to the

ground, and there is no EVIDENCE that Defendant Mock kicked that officer while

he/she was on the ground.

This is yet another instance where there is a failure of proof with regard to

the Government's proffer.  This seems to be a pattern.

b. Video 2.

As for the second incident at just before 2:34, Video 2 shows Defendant

Mock placing both his hands on the police shield being held by Officer SK, and he

pushed on the shield.  Officer SK stumbled and fell over backwards.

A shove and a stumble.

That's what the EVIDENCE shows.

Beyond that there is nothing but hyperbole, supposition, and invention by

the Government in claiming this action makes Mr. Mock too dangerous to release

pending trial.

Close attention to the video shows that at the moment Defendant Mock

stepped towards Officer SK with his arms extended, Officer SK's head was turned

to his right – making it likely that Officer SK was not looking at Defendant Mock

at the time of the shove and did not anticipate him doing so.

22

The video also shows that Officer SK was not "shoved to the ground" by Defendant Mock as the Government claimed – Officer SK stumbled when he stepped backwards and onto a police shield that was on the ground with the "rounded" front facing down.  He stumbled and fell because of a loss of balance caused by the unstable footing when he stepped onto the shield.

The degree to which Officer SK's fall was accidental and not caused by Defendant Mock's push is a matter for the jury.  But for purposes of this Motion, the Video 2 does any intent on the part of Defendant Mock to injure Officer SK or any other Officer.

    c.    <u>The Cause of</u> <u>Officer SK's "Injury" Underwent a Notable Change</u>.

As for Officer SK's "injury" to his elbow, the Government's account AGAIN involves a  proffer in its Emergency Motion that is not supported by the actual EVIDENCE in the Government's possession at the time of the proffer.

Officer SK was interviewed by FBI SA Alvarez on May 10, 2021, approximately four weeks prior to the arrest of Defendant Mock.  The FBI 302 of that interview is attached to the Shipley Declaration, marked as Exhibit "B", filed in Support of this Motion.

The FBI 302 reflects that Officer SK was shown Video 2 and identified himself as the Officer who fell to the ground.

SA Alvarez's 302 goes on to say the following with regard to Officer SK's injury:

Officer [SK] recalled being shoved onto his back by one of the rioters. <u>During the melee, Officer [SK's] right</u> <u>elbow was hit</u> right in the area where two protective pads on his arm meet." [Emphasis added].

When Defendant Mock was arrested, SA Alvarez was the Affiant on the Complaint Affidavit, and she wrote the following statement under oath:

"According to Victim 2, <u>his right elbow hit the ground</u> right in the area where two pads come together after the shove, causing excruciating pain at the time of impact."

The Complaint Affidavit is dated June 10, 2021, exactly one month after the interview of Officer SK. During the 30 days between the two documents – the 302 of her interview and the Affidavit supporting the Criminal Complaint, the mechanics of how Officer SK's injured his elbow changed.

She first wrote he suffered his elbow injury from being hit during the melee without reference to Mr. Mock's actions.

One month later she wrote that his right elbow hit the ground right in the area where the two pads come together as a result of Mock's shove.

This is a curious change in the description of the mechanism by which Officer SK came to suffer his injury. Presumably SA Alvarez referred to her 302 when she drafted her sworn Affidavit. Judge Howell relied in part on her sworn Affidavit for the factual findings in making her determination to detain Mr. Mock.

This is a curious alteration because it shifts the cause for Officer SK's injury from some unknown event "during the melee" directly onto Mr. Mock who the

24

Government was seeking to detain just in time to do so.  Her statement in the

Affidavit is not supported by what she wrote in the 302 of her interview.

> "Officer [SK] reviewed video footage of the rioting, which included a man using a shield to shove a USCP Officer.  Officer [SK] identified himself as the one who was shoved."

The video shows Officer SK's padded right forearm making impact with the

ground as he fell backwards and tried to brace his fall.  Officer SK could have

pinpointed that as the moment his elbow was injured, but he did not.

Was there an elbow injury connected to anything done by Defendant Mock?

Once again the EVIDENCE is at odds with the Government's proffer – evidence

the Government had in its possession but did not share with the Court.

3.   Mr. Mock's Prior Conviction For Assault With a Dangerous Weapon

Presiding Judge Howell offered a balanced and informed view of the extent

to which Mr. Mock's 2009 conviction in Minnesota for Assault with a Dangerous

Weapon should bear on the question of whether to detain him.

While not discounting the serious nature of his prior conviction – which

involved a "BB pistol" and not a firearm – Judge Howell recognized that the crime

was followed by seven years of Mr. Mock being on actively supervised probation

during which time Mr. Mock did not have a single probation violation.  This showed

Mr. Mock willingness to comply with conditions of pretrial release that might be

imposed.

What concerned Judge Howell about the prior conviction was not so much the offense, but rather the conduct in the prior incident where Mr. Mock threatened a bystander who attempted to intervene while the assault was happening, as well as asking his ex-wife to lie to the police.  To Judge Howell, the facts of the prior incident were alarmingly similar to the allegations in the Government's proffer in this case that Mr. Mock had threaten and harassed MV during "unannounced visits" to her house after they broke up.

Judge Howell said Mr. Mock's criminal history standing alone was not sufficient to detain him – only when combined with the alleged interference with witnesses was the issue of detention property entertained:

> *Standing alone, defendant's single, eleven-year-old conviction would not be either dispositive nor even weigh heavily in favor of pretrial detention*. Yet, the similarities between defendant's violent and aggressive conduct underlying his prior assault conviction and defendant's recent threatening conduct towards his ex-girlfriend in service of concealing evidence against him, *and particularly the menacing nature of defendant "show[ing] up unannounced" to his ex-girlfriend's house and harassing her*, raises serious question whether defendant can be safely released under any conditions without risking danger to prospective witnesses.

But as is made clear above, the EVDIENCE shows Mr. Mock never showed up at MV's house in a menacing nature, and he never harassed her in any such "unannounced visits" as proffered by the Government.

The Government's misleading proffer to Judge Howell regarding these issues was a combination of misstatements, half-truths, inventions, and material omissions of factual information that was in the Government's possession.

## **CONCLUSION**

The Government based its argument for detention on three grounds:

1) Mr. Mock is charged with two violent assaults on law enforcement officers;

2) He had a prior history of violence which resulted in a felony conviction in Minnesota 11 years earlier; and

3) he made unannounced visits to his ex-girlfriend, a potential witness against him, during which he threatened and harassed her.

There is no clear evidence – certainly not sufficient to satisfy a "clear and convincing" standard – of "violent assaults" on two different officers.

Judge Howell stated unequivocally that Mr. Mock's prior conviction standing alone would not be sufficient to justify his detention pending trial.

The proffer by the Government regarding alleged threats and harassment by Mr. Mock aimed at his ex-girlfriend are not just unsupported by MV's statements as reflected in the 302 of her interview, the Police Report of the Eagan Police Department, and the statement of CF.

Based on the record now before this Court, Mr. Mock respectfully requests that this Court grant him release pending trial on whatever terms and conditions of pretrial release this Court deems appropriate.

Dated: May 6, 2022                       Respectfully submitted,

                                         /s/ William L. Shipley
                                         William L. Shipley, Jr., Esq.
                                         PO BOX 745
                                         Kailua, Hawaii 96734
                                         Tel: (808) 228-1341
                                         Email: 808Shipleylaw@gmail.com

                                         *Attorney for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I, William L. Shipley, hereby certify that on this day, May 6, 2022, I caused a copy of the foregoing document to be served on all counsel through the Court's CM/ECF case filing system.

/s/ William L. Shipley
William L. Shipley, Jr., Esq.