# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-444 (JEB)** |
| **BRIAN MOCK,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brian Mock to 109 months of imprisonment, three years of supervised release, $2,000 in restitution, and the mandatory $710 special assessment. The government's recommended custodial sentence lies at the midpoint of the applicable Sentencing Guidelines range.

## I.      INTRODUCTION

Defendant Brian Mock—a 44 year-old owner of a landscaping company and a former debt collector—participated in the January 6, 2021 attack on the United States Capitol, a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

In the month leading up to January 6, 2021, Mock repeatedly expressed in public Facebook posts, text messages with his best friend, and conversations with his oldest son, his beliefs that Joe Biden, Nancy Pelosi, and the Democrats had stolen the election and a violent mass uprising was needed to keep these "tyrants" and "Socialists" from taking power. *See* Government Trial Exhibits ("GEX") 803-806, 808, 810. Mock was well-aware that Congress planned to convene on January 6 to review and certify the Electoral College ballots. He wanted to stop it, and he was prepared to use force to do so.

On January 5, 2021, Mock traveled to Washington, D.C. from his Minnesota home along with his girlfriend and his best friend. The next day, between approximately 2:29 p.m. and 2:35 p.m., during the riot at the Capitol, Mock helped other rioters remove police barricades at the northern end of the West Plaza and committed four separate assaults against police officers who were attempting to block the rioters' progression and defend the West Plaza. He pushed one U.S. Capitol Police ("USCP") officer to the ground and kicked or attempted to kick him. He threw a broken flagpole at another. He pushed a third officer in the back. Mock shoved a fourth officer to the ground, using both hands and all of his body weight to do so, leaving the officer vulnerable to the mob. Mock then stole two USCP riot shields and passed them back to other rioters. Afterward, Mock bragged to his best friend that he "Got sprayed directly 3 times, took a flash bang and took down at least 6 cops" and that he "took 3 gates 2 shields and a bunch of equipment." GEX 909. Mock proceeded to trial, where he represented himself for the second half of trial, testified, and

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

uttered repeated falsehoods and mischaracterizations. The government's recommended sentence of 109 months of incarceration reflects the gravity of Mock's conduct; his conviction on 11 counts, including four violations of 18 U.S.C. § 111(a)(1) and one of 18 U.S.C. § 1512(c)(2); his pride in his behavior; and his steadfast refusal to accept responsibility for the criminality of his actions.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the affidavit ("Statement of Facts") filed in support of the original Complaint in this case, ECF No. 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.9 million dollars.

### B.     Mock's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-January 6 Social Media*

Mock knew that Congress planned to certify the results of the election on January 6, 2021, *see* GEX 807, Transcript of Trial Testimony by Mock on June 22, 2023 ("Mock 6/22 Tr.") at 14:16-15:7, so he repeatedly posted on Facebook to rally "real Patriots to actually fight back," GEX 804, and to spark "millions of armed citizens," *id.* to "stand up and do what needs to be done," GEX 803. Mock left no ambiguity about what he felt was necessary. He called for "total rebellion," which Mock described as "a Redeclaration of Independence, a thoroughly [*sic*] cleansing of our political/judicial system, complete upheaval of the monetary system/economy, a complete destruction of the Federal government, and a new set of laws .. .." GEX 810.

3

| | |
|---|---|
| **Time** | 2021-01-03 20:43:36 UTC |
| **Type** | Comments |
| **Summary** | Brian Mock replied to a comment on a post from January 2. |

`@[700755903:2048:Brandi Reed-Robertson] Let's be honest, most people are misinformed at best, willfully ignorant a majority of the time. If you have truly done your research you know who the true enemy is. You understand that this is a war that has been raging for generations, spanning hundreds of years. If you don't understand this, follow the money. Once you understand fixing the situation involves nothing short of total rebellion, a Redeclaration of Independence, a thoroughly cleansing of our political/judicial system, complete upheaval of the monetary system/economy, a complete destruction of the Federal government and a new set of laws, rules and way of life put into place for this country, well, once you understand that, your framework and mindset for what is happening and what must be accomplished should become your focus. All of the rest of the noise is just that, noise. Find those who truly understand what is happening and who is the enemy. Find those who understand their end game and their tactics. Surround yourself with those Patriots who would lay down their lives for this country. Prepare for what is coming and be willing to act or get out of the way. Sic Semper Tyrranis! This is our rallying cry and the measure of our resolve. No more talk. DC 1/6/21`

*GEX 810*

Mock declared that January 6, 2021 in Washington, D.C. was the date when, and place where, this violent "total rebellion" of armed citizens against the government should occur, *id.*, which he justified by quoting the Declaration of Independence, *see* GEX 804, citing the myth that it only took 3% of the American colonists to overthrow the British government, *see* GEX 805. He repeatedly invoked the phrase "*sic semper tyrannis*" as a motto and rallying cry. *See* GEX 808, 810-812. On January 1, 2021, he posted an implicit threat of violence against Speaker Pelosi, GEX 808 ("Well Nancy, that ain't the worst thing that's going to happen to you this week."), and on January 4, 2021, he doubled down on that implicit threat, GEX 812 ("She should be afraid of us!!").

### Travel to Washington, D.C.

Mock worried that "There aren't enough men who will actually stand up and do what needs to be done," GEX 803, so he recruited his girlfriend, Misty Visnovec, and his best friend, Connor Finnigan, to travel with him to the "Stop the Steal" rally being held in D.C. on January 6, 2021.

4

*See* GEX 905-907; Mock 6/22 Tr. at 17:17-21. Mock expected to participate in violence in Washington, D.C. on January 6. He told his eldest son, A.J., that he might die there. *See* Trial Testimony of A.J. Mock. Finnigan initially planned to stay in Minnesota for financial reasons. *See* GEX 905, 907. Mock instructed him, "If I don't come back, just make sure AJ does the right thing with all my stuff." GEX 908. Finnigan also was worried about violence and counseled Mock against bringing Visnovec to D.C., given that she is a mother of children who depend on her.  *See* GEX 906. Despite those fears and the three children he would leave behind if he died, Mock drove from Minnesota to D.C. on January 5, 2021, bringing Finnigan and Visnovec with him. *See* Mock 6/22 Tr. at 17:17-18:5.

### *Approach to the Capitol*

On January 6, 2021, Mock, Visnovec, and Finnigan attended the "Stop the Steal" rally near the Washington Monument. *See* GEX 501, 502. Afterward, they marched onto the restricted U.S. Capitol grounds, along with thousands of others. *See* GEX 503. Mock, Visnovec, and Finnigan arrived at the Peace Circle—the outer edge of the restricted area—at approximately 2:00 p.m. *See* Mock 6/22 Tr. at 22:6. From there, they walked to the West Plaza, where they heard an explosion. *See id.* at 25:5-6. By that point, the riot was well underway. The air was filled with OC spray and tear gas; they saw a panicked man with "massive blood" dripping from his face; they observed police officers standing in a line behind bike rack barricades; *see id.* at 25:16-26:1. None of this deterred them.

### *Mock removes barricades*

At some point, Finnigan became separated from Mock and Visnovec, who maneuvered their way to the front of the mob at the north end of the West Plaza. There, they were confronted

with two barriers: first a row of connected metal bike racks; second, just behind the row of connected metal bike racks was a line of police officers who wore head-to-toe riot gear, and stood shoulder-to-shoulder. At 2:03 p.m., police announced over the loudspeakers that the area was restricted, which Mock captured on a cell phone video he recorded. *See* GEX 913. Nevertheless, Mock beckoned for the crowd of rioters to come forward, and pressed closer to the line of police officers. GEX 506.1; 506.2. Rioters fought with the police, and attempted to push the barricades out of the way. *See* GEX 101; 401.2. Police officers struggled to hold their ground and maintain the positions of the barricades. *See id.* Mock applauded when a wooden post thrown by a rioter hit an officer. *See* GEX 507.

### *Assault #1 (Count 3): Push and kick against Officer Collins*

At approximately 2:28 p.m., Mock helped rioters remove at least one of the bike rack barricades, which he passed back to the mob, away from the police. *See* GEX 401.7, 510.2. Rioters surged forward and fought in hand-to-hand combat with police officers, including USCP Officer Jonathan Collins. During that fight, Officer Collins fell to the ground. When he tried to get up, Mock pushed him back down. *See* GEX 402.b.



*GEX 402.b: Mock pushing Officer Collins back down*

Mock then kicked, or attempted to kick, Officer Collins. *See id.*



*GEX 402.b: Mock kicking, or attempting to kick, Officer Collins*

**Assault #2 (Count 5): Mock throws broken flagpole at line of officers**

After that battle, Mock and Visnovec moved to the south end of the West Plaza, where they

again encountered lines of riot gear-clad USCP and Metropolitan Police Department ("MPD")

officers defending the Capitol building and trying to prevent rioters like Mock and Visnovec from overtaking it. At approximately 2:33 p.m., someone passed a flagpole and an attached flag near Mock's head. *See* GEX 103.b. Mock grabbed the flagpole, broke it in half, *see id.*, and hurled it like a spear at the line of police officers, *see* GEX 511.d.



*GEX 511.d: Mock hurling broken flagpole at line of officers*

### Assault #3 (Count 6): Mock pushing officer in the back

Less than a minute later, an unidentified USCP officer was separated from his fellow officers and was walking through the crowd. *See* GEX 103.c. Mock shoved the officer in the back, causing him to stumble forward. *See* GEX 511.e; 103.c.



*GEX 511.d: Mock pushing officer in the back*

### Assault #4 (Count 4): Mock shoves Officer Karlsen in the chest, knocking him down

About a minute after Mock shoved an officer in the back, at approximately 2:34 p.m., a group of USCP officers who were trying to hold a defensive line on the south end of the West Plaza—directly across from Mock—decided to retreat to the next highest level of the Capitol, the Lower West Terrace, and regroup. *See* GEX 103. Officer Stevin Karlsen was among that group and one of the few officers carrying a riot shield. Accordingly, Officer Karlsen stayed back as his colleagues retreated, held his shield up to try to provide his colleagues with cover from the various items rioters threw at them and chemical irritant sprays rioters deployed against them. *See id.* As Officer Karlsen slowly backed up, Mock stood in front of him, yelling at him. When Officer Karlsen took a moment to glance over his shoulder to avoid tripping over the stair behind him, Mock took advantage of Officer Karlsen's temporary distraction and used both hands to shove Officer Karlsen in the shield, knocking Officer Karlsen off his feet and onto the ground. *See* GEX 403.c; 103.d.



*GEX 403.c: Mock shoving Officer Karlsen in the shield/chest, knocking him to the ground*

### *Mock steals two riot shields*

Seconds later, as Officer Karlsen and his colleagues retreated from Mock and the other violent rioters, Mock stole two six-foot-tall USCP riot shields that he saw on the ground. He picked them up and passed them back to other rioters. *See* GEX 403.d; 103.e. Mock's thefts deprived the USCP officers of the ability to use those two shields to protect themselves and provided the rioters with additional weapons and defensive items.



*GEX 403.4: Mock steals the first of two USCP riot shields*

Along with other rioters, Mock then pursued the officers as they retreated, *see* GEX 514.1; 514.2; 511.8, forcing the officers to use a chemical irritant against Mock and the others in that mob to keep the threat at bay and allow the officers to complete their retreat, *see* GEX 511.9; 815.a. Despite the battles with police, the chemical irritants in the air, and the audible commands to disperse, Mock remained on the West Plaza and/or Lower West Terrace for almost three more hours, during which he recorded a video on his cell phone as rioters near him chanted "We stopped the vote!" *See* GEX 516.8. At some point during that time, Mock acquired a police baton, which he carried as a weapon from that point forward. *See* GEX 518.1.

### Aftermath on January 6

Shortly after leaving the Capitol grounds and in the days that followed, Mock bragged about what he had done in text messages with Finnigan, his son, and a friend named Krista, as well as in subsequent Facebook posts. For example, Mock boasted to Finnigan, "Got sprayed directly

11

3 times, took a flash bang and took down at least 6 cops." In another, he stated, "I took 3 gates 2 shields and a bunch of equipment. I shouldn't have thrown em." GEX 909. Mock approvingly responded, "Sweet" when Finnigan told him that he saw rioters "bashing windows n stole mace cannons and dragged a cop out to the point above You." *Id.* Similarly, Mock told his son A.J. that "It was a hell of a fight." In response to the police's physical crowd control techniques, he "got mine" and "did some damage," meaning he hurt police officers in retaliation, which he characterized as necessary to make "the[m] understand the measure of our resolve." *See* GEX 910.

### *Mock's Testimony at Trial*

Mock represented himself at trial, testified, and denied his factual and legal guilt. During Mock's testimony, he also made multiple false statements, many of which the Court painstakingly detailed in announcing its verdict. *See* Verdict Tr. at 3:21-6:19. For example:

- Mock at first claimed that he did not know Congress planned to certify the election on January 6, *see* Mock 6/22 Tr. at 14:16-17, before later admitting that he did know, which was echoed by the testimony of Mock's son, a defense witness, *see* Verdict Tr. at 4:5-10.

- Mock testified that "there was not a single sign that I could see that the area was closed," Mock 6/22 Tr. at 21:24-25, "nobody was there to stop us," *id.* at 23:23-24, and "I didn't know I couldn't be there," *id.* at 24:4, but—as the Court pointed out— that was clearly a lie due to the "sirens, the tear gas," and the snow fencing still present in some places, Verdict Tr. at 4:13-14, not to mention the many uniformed police officers wearing riot gear and standing behind barricades, at least one of which Mock helped remove. In the Court's words, "no reasonable person would

have so thought" that he was allowed on the Capitol grounds, *id.* at 4:15, and Mock
is "very intelligent," *id.* at 3:21.

- Mock testified that he "was panicked" and "didn't know what to do" when he
  encountered the tear gas used by the police to repel rioters like him, Mock 6/22 Tr.
  at 32:25, and yet in a selfie-style cell phone video recorded by Visnovec, it's clear
  that Mock was not remotely "panicked" by being gassed at all, *see* GEX 815.a.
  Instead, Mock calmly, and with a smile, brags about being "maced three times,"
  admires how red and "crispy" his eyes are, proposes climbing the Capitol wall,
  notes that he called his "son to tell him that [he] was in the middle of a riot," and
  jokes about the police committing "a hate crime" by using crowd control tactics
  against him. *Id.; see also* Verdict Tr. at 4:16-20.

- Mock testified that he only briefly and inadvertently touched a bike rack, and even
  then only did so because other rioters pushed him into it. Mock 6/22 Tr. at 36:20-
  25. But that was proven to be a lie by video evidence showing Mock helping to
  pick up and move the barricade out of the police's area and reach, *see* GEX 401.7,
  510.2, Mock's own text messages, in which he bragged about removing three
  barricades, GEX 909, and the selfie-style video he recorded with Visnovec, *see*
  GEX 815.a.

- Mock testified that he only hurled the flagpole at the officers to "g[e]t it out of my
  hand," Mock 6/22 Tr. at 44:18-19, but—as the Court noted—that was an obvious
  lie. In the Court's words to Mock in announcing the verdict, "If you really wanted
  to get it out of your hand, you would drop it. You would toss it to your side, drop

13

it, but you don't throw it at the line of officers. That's not trying to get it out of your hand." Verdict Tr. at 5:2-8.

- Mock testified that his January 1 Facebook post, GEX 808 ("Well Nancy, that ain't the worst thing that's going to happen to you this week"), referred to Nancy Sinatra, not Speaker Nancy Pelosi, which was such a blatant lie that it was comical. *See* Verdict Tr. at 5:14-19.

- Mock testified that he only shoved Officer Karlsen in self-defense because he believed Officer Karlsen had said "…or I'll shoot" to him and reached toward his hip, where Mock assumed Officer Karlsen's gun was holstered. *See* Mock 6/22 Tr. at 46:25-47:13. As the Court explained in announcing its verdict, this claim was completely incredible. *See* Verdict Tr. at 6:10-17.

Mock further attempted to deceive the Court through his use of Thomas Tatum as a fact witness. Mock presented Tatum as an "independent journalist" eyewitness and called him to impugn police action on the West Plaza, arguing that inappropriate police aggression was to blame for the mob's behavior. When Mock entered video Tatum recorded on the West Plaza into evidence, Mock deliberately tried to hide from the Court Tatum's encouragement of the mob to assault police officers and steal their gear by playing Tatum's video on mute. When the government played the same video with the volume up during cross-examination, the government exposed Mock's deceitfulness and discredited Tatum's testimony.

### Post-Trial Statements

Post-trial, Mock provided an extensive interview to *The New York Times* in which he continued to justify his actions on January 6, refused to accept responsibility, and advanced

14

excuses for his criminal conduct that the Court already rejected.[2] Specifically, Mock implicitly denied that he chose to join the mob, chose to storm the Capitol, and chose to engage in violence. Instead, he suggested he was unwillingly carried into the fray by the mob ("There were throngs of people, like a river. You're in the current. You're getting pushed.") and that he was the victim of "some crap luck that day." He continued to blame the police for his actions. ("I had a concussion grenade go off and explode right on me. [. . .] Can you see how that would provoke a crowd?"). He insisted—just as he did at trial unsuccessfully—that he pushed Officer Karlsen to the ground in self-defense because he heard Officer Karlsen threaten to shoot him, despite the fact that audio recordings do not support his story. He reiterated his beliefs that "his cause [on January 6] was righteous" and that he is less culpable than other January 6 defendants because he does not share some of their beliefs. At no point did Mock express remorse.

### Injuries

Officer Karlsen testified that as a result of Mock shoving him down, he experienced pain where his body struck the ground. Mock's shove left Officer Karlsen flat on his back and vulnerable to attacks from others, which caused Officer Karlsen to panic; indeed, while Officer Karlsen was on the ground, other rioters kicked and hit him. Karlsen Tr. At 165:11-14. Also during that time, Officer Karlsen was sprayed by a chemical irritant, which caused him to experience difficulty breathing and seeing. *Id.* at 166:9-11. Another officer helped Officer Karlsen to his feet, allowing Officer Karlsen to retreat, decontaminate himself, and recover, though he "couldn't see out of [his] right eye" and "was having a hard time breathing." *Id.* at 166:17-18. Officer Karlsen

---

[2] "A Jan. 6 Defendant Pleads His Case to the Son Who Turned Him In," *The New York Times*, Nov. 19, 2023, available at: https://www.nytimes.com/2023/11/19/us/politics/jan-6-trial-father-son.html (last access Dec. 18, 2023).

further stated that his experience on January 6, and this incident in particular, caused him to consider leaving law enforcement entirely and to experience psychological trauma, including trust issues, that continue to bother him today.

## III.    THE CHARGES AND TRIAL VERDICT

On March 15, 2023, a federal grand jury returned a second superseding indictment charging Mock with 11 counts, including, Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count 1); Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 2); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Counts 3, 4, and 6); Assaulting, Resisting, or Impeding Certain Officers with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and 111(b) (Count 5); Theft of Government Property, in violation of 18 U.S.C. § 641 (Count 7); Entering or Remaining in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count 8); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count 9); Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count 10); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 11).

During the ensuing bench trial, the Court found that the flagpole hurled by the defendant into a line of police officers did not qualify as a "deadly or dangerous weapon," and thus the Court dismissed the enhancements charged in each of Counts 5, 8, 9, and 10, while leaving the underlying lesser offenses intact. On July 12, 2023, the Court convicted Mock of Counts 1-4, 6-7, and 11 as charged, and convicted Mock of the lesser versions of Counts 5 and 8-10.

## IV.    STATUTORY PENALTIES

Mock now faces sentencing on each of the counts listed above. The maximum terms of incarceration for each count are detailed in the chart below.

| Count | Statute | Maximum Term of Imprisonment |
|---|---|---|
| 1 | 18 U.S.C. §§ 1512(c)(2) and 2 | 20 years |
| 2 | 18 U.S.C. § 231(a)(3) | 5 years |
| 3 | 18 U.S.C. § 111(a)(1) | 8 years |
| 4 | 18 U.S.C. § 111(a)(1) | 8 years |
| 5 | 18 U.S.C. § 111(a)(1) | 8 years |
| 6 | 18 U.S.C. § 111(a)(1) | 8 years |
| 7 | 18 U.S.C. § 641 | 1 year |
| 8 | 18 U.S.C. § 1752(a)(1) | 1 year |
| 9 | 18 U.S.C. § 1752(a)(2) | 1 year |
| 10 | 18 U.S.C. § 1752(a)(4) | 1 year |
| 11 | 40 U.S.C. § 5104(e)(2)(F) | 6 months |

For each of the felony counts, *i.e.* Counts 1-6, the Court may also impose a term of supervised release of not more than three years and a fine of up to $250,000, and the Court must impose a mandatory special assessment of $100 per count.

As for the Class A misdemeanor counts, *i.e.* Counts 7-10, Mock faces up to one year of imprisonment, a maximum of one year of supervised release, a fine of up to $100,000, and a mandatory special assessment of $25 per count. On the Class B misdemeanor count, *i.e.* Count 11, Mock faces up to six months of imprisonment, a fine of up to $5,000, and a mandatory special assessment of $10.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

17

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The revised PSR includes several related errors, as detailed below.[3]

A. *The 6-point Official Victim Enhancement Should Be Applied to Groups 2, 3, and 4*

Group 2 (Count 3), Group 3 (Count 4), and Group 4 (Count 6) should all receive 6-point enhancements under U.S.S.G. § 3A1.2.

While the draft PSR correctly applies a 6-point Victim Related Adjustment to Group 2 (Count 3), *see* Draft PSR ¶ 62, and Group 3 (Count 4), *see* Draft PSR ¶ 68, the draft PSR does so solely on the basis of U.S.S.G. § 3A1.2(c)(1). As described further below, U.S.S.G. § 3A1.2(b) applies as an alternative basis. The Court should order Probation to amend the PSR accordingly.

Relatedly, Probation has incorrectly applied a mere 3-point Victim Related Adjustment to Group 4 (Count 6) pursuant to U.S.S.G. § 3A1.2(a)(1), *see* Draft PSR ¶ 74, whereas Group 4 should include the higher 6-point Victim Related Adjustment pursuant to U.S.S.G. § 3A1.2(b). Indeed, section 3A1.2 states, in relevant part:

> (a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by 3 levels.
>
> (b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by 6 levels.

---

[3] The PSR incorrectly suggests that the government did not provide Probation with its objections to the draft PSR prior to the final PSR being issued. *See* PSR (Addendum) at 34. On September 21, 2023, the government timely sent its objections to the draft PSR to Probation, copying defense counsel and the defendant, in a formal letter transmitted via e-mail. The government failed to file the appropriate form on the docket, however, which led to a miscommunication when Probation transferred responsibility for this case to another Probation officer, who was unaware of the government's e-mailed objections letter.

Here, section 3A1.2(b) applies because all three of its preconditions are met, *as the draft PSR already establishes*. First, as the draft PSR correctly reflects, Mock's assaults targeted "a government officer or employee," satisfying subsection (a)(1), and second, the assaults were "motivated by such status," satisfying subsection (a)(2). *See* Draft PSR ¶¶ 62, 68, 74. Finally, as required by section (b), "the applicable Chapter Two guideline is from Chapter Two, Part A," which the Draft PSR already reflects as well. *Id.* ¶¶ 61, 67, 73. Consequently, because the offenses satisfy subsections (a)(1) and (a)(2), and the applicable guideline is from Chapter Two, Part A, § 3A1.2(b) applies. The Court should order Probation to amend the PSR to reflect a 6-point enhancement as the Victim Related Adjustment in paragraph 74.

B. *Ripple Effects of Applying the Correct Official Victim Enhancement to Group 4*

Correctly applying the 6-point enhancement found in § 3A1.2(b) to Group 4 raises the adjusted offense level for Group 4 from 19 to 22. The Court should order Probation to amend the PSR accordingly. Draft PSR ¶ 78.

Correcting the adjusted offense level (subtotal) for Group 4 from 19 to 22 changes the units analysis. *See* Draft PSR ¶ 85. With an adjusted offense level of 22, Group 4 generates 0.5 units. The total number of units should thus be 2.5. The Court should order Probation to amend the PSR accordingly. Draft PSR ¶ 85.

Adjusting the number of units in paragraph 85 from 2 to 2.5, *see supra*, generates another ripple effect. Pursuant to § 3D1.4, paragraph 87 should be adjusted to 2.5. This in turn raises the Combined Adjusted Offense Level to 30, *see* Draft PSR ¶ 88, and the Total Offense Level to 30, *see id.* ¶ 91. The Court should order Probation to amend the PSR accordingly. *Id.*

Raising the total offense level to 30, *see supra*, results in an increase to the custodial

19

Guideline range. The Court should order Probation to amend the PSR to reflect a custody range of 97-121 months. *See* Draft PSR ¶ 146.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case because Mock personally engaged in violence or credible threats of violence against people or property, as assessed under a totality of the circumstances. Indeed, the Court convicted Mock of four violations of 18 U.S.C. § 111(a)(1) (Counts 3-6), as well as one violation of 18 U.S.C. § 231(a)(3), based on the evidence presented at trial that Mock: (1) pushed Officer Collins back to the ground and then kicked him or attempted to kick him; (2) hurled a broken flagpole like a spear at a line of officers; (3) pushed an officer in the back; and (4) shoved Officer Karlsen to the ground using both hands and his full body weight. Along the way, Mock verbally encouraged others to engage in violence and facilitated violence against officers by stealing two of their defensive shields.

The government is aware of at least three cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); and *United States v. Dillard*, 23-cr-49 (JMC).

The Court should not apply § 4C1.1 here for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one

hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite

a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[4]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 96. Accordingly, based on the government's calculation of the defendant's total adjusted offense level at 30, Mock's Guidelines imprisonment range is 97 to 121 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offenses

As shown in Section II(B) of this memorandum, Mock's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Mock spent weeks prior to January 6 stoking violence on social media. He then joined the riot at the Capitol, helped remove two police barricades, assaulted four officers, and stole two riot shields. Afterward, he expressed no remorse; instead, he bragged about

---

[4] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

his criminal conduct and justified it. The nature and circumstances of Mock's offenses were of the utmost seriousness, and they fully support the government's recommended sentence of 109 months of incarceration.

### B. The History and Characteristics of the Defendant

Although Mock has maintained steady employment—first as a debt collector and most recently as the owner of a small landscaping company—for most of his adult life, he has a significant and disturbing history of violence and intimidation that weighs in favor of a lengthy period of incarceration.

On May 16, 2009, during a birthday party for his oldest son at his home, Mock—who had been drinking all day—became incensed by three juvenile boys whom he believed had started a fire nearby. Mock grabbed a gun from his home, approached the juvenile boys, screamed at them, and pointed his gun at their heads, threatening to shoot them. An unrelated adult female witnessed this scene from her car, pulled over, and tried to intervene. She asked what was going on, to which Mock responded that it was 'not your fucking business'. He appeared to be drunk and said something about the juveniles having set a fire. The boys were shaking and did not appear to have any idea what was going on; the woman suggested that they should call the boys' parents. At that point, Mock shoved her away and returned to his house. The woman called the police. A local SWAT team arrived and set up a perimeter around Mock's house. Mock refused to exit the house. Instead, he barricaded himself inside with his gun, shaved his head, and told the police they would have to get a warrant. Many hours later, a police negotiator finally coaxed Mock outside. Mock mentioned that he was suicidal. Recently, an FBI agent interviewed a parent of one of the children Mock victimized. The parent stated, in substance, that the incident psychologically traumatized

both him and his child.

A few months later, on November 1, 2009, Mock assaulted his ex-wife, Individual-1. She was sleeping in the basement with her 7-year-old son when Mock came home, after having been drinking, and began throwing things around the house. He then demanded that she "get out." Individual-1 refused and instead went upstairs and laid down on the bed. Mock followed her upstairs, grabbed her, and threw her off the bed. She tried to escape to the basement, but Mock followed her, threw her on the basement floor, and repeatedly kicked her. Mock then left the residence. Individual-1, along with her child, fled to a domestic violence shelter and obtained an order of protection/separation against Mock. While Individual-1 chose not to pursue the resulting domestic violence charges against Mock, she later stated that she only did so because Mock was blackmailing her. Specifically, he threatened to get her fired from her job if she pursued the charges. She was so afraid of losing employment and the income it provided for her and her child that she complied.

Meanwhile, during the pendency of this case, Mock's now ex-girlfriend, Visnovec, who joined him for the riot at the U.S. Capitol, obtained a restraining order against him because she felt scared of his behavior and potential behavior in the aftermath of their breakup.

Mock's crimes on January 6 thus were not an isolated event in an otherwise law-abiding life, nor were they the first time he resorted to violence and intimidation to get what he wanted. Mock cannot claim that violence was restricted to one time of his life or one set of relationships. His frightening personal history and repeated efforts to obstruct legal proceedings—such as by intimidating and blackmailing Individual-1 and by testifying untruthfully—weigh heavily in favor of a lengthy term of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Mock's criminal conduct on January 6 was the epitome of disrespect for the law. As Judge Berman Jackson stated at sentencing in *United States v. Cronin*, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." Tr. 06/09/23 at 20.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Mock has a criminal history category of I, his history of arrest and conviction shows a clear pattern of assaultive behavior. *See* Section VI(B) *supra.* Second, Mock has never expressed remorse and contrition for his criminal conduct, even after this Court

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

convicted him on each of the 11 counts against him and explained the rationale for its verdict. Instead, as evidenced by the interview he gave *The New York Times*, Mock continues to believe his conduct was justified both by his concerns about the election and the actions of the police in response to the riot. Moreover, Mock's statements in the immediate aftermath of January 6 demonstrate pride, not shame, for his violent conduct in support of what he believed to be a righteous cause.

Mock appears to have learned nothing—or at least none of the right lessons—from his prosecution and conviction in this case. The Court cannot have any confidence that Mock would not engage in the exact same behavior in the future if he thought it was justified, if he thought— again—that it was a necessary and righteous response to what he perceived as tyranny. With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Mock in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

According to the government's records, so far courts in this district have sentenced approximately 29 defendants who—like Mock—were convicted of violations of 18 U.S.C. §§ 1512(c)(2), 231(a)(3), and 111(a)(1) due to their conduct on January 6. The average sentence for such defendants has been 68 months of incarceration, with a high of 170 months (*United States v. Peter Schwartz*, 21-cr-178-APM) and a low of 32 months (*United States v. David Judd*, 21-cr-40-TNF). Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide the most suitable comparisons to the relevant sentencing considerations in this case.

The defendant in *United States v. Thomas Harlen Smith*, 21-cr-599 (RBW), provides the closest match to Mock, albeit an imperfect one. Smith repeatedly fought with police officers in the Tunnel and on the Upper West Terrace, assaulting them in ways that mirror Mock's conduct. For example, Smith pushed against the line of officers. He kicked one officer in the back, sending the officer to the ground. He threw a metal pole at the group of officers, striking one. Smith cheered when others assaulted the officers as well. Like Mock, Smith did not enter the Capitol building, though he repeatedly struck one of the building's windows in an attempt to break it. Smith testified at a jury trial. Judge Walton noted that he found many parts of Smith's testimony incredible, and the jury convicted Smith on all counts. Like Mock, Smith's criminal history included two disturbing prior incidents, though Smith also picked up a new unrelated felony charge (for

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

embezzlement) in March 2021, before he was charged for his January 6 conduct. After a conviction at his jury trial, Judge Walton sentenced Smith to 108 months of imprisonment, which is merely one month less than the government has recommended for Mock here.

In *United States v. Kyle Fitzsimons*, 21-cr-158 (RC), the defendant—just like Mock—committed four assaults against four different officers in the span of approximately five minutes on the West Plaza. Like Mock, Fitzsimons did not enter the Capitol building, exhibited pride for his conduct, which he glorified afterward, and was convicted on all counts after a bench trial. Judge Contreras sentenced Fitzsimons to 87 months of incarceration. While the impact of Fitzsimons' conduct was worse than Mock's—Fitzsimons caused a career-ending injury to one of the officers he assaulted—Fitzsimons' personal history showed no prior incidents of violence, obstruction, or witness intimidation. In contrast, Mock has exhibited a history of each of those things and therefore exhibits a higher need for specific deterrence. Additionally, Fitzsimons did not remove barricades, unlike Mock who did so; Fitzsimons did not steal property, unlike Mock, who stole two USCP riot shields; and Fitzsimons did not engage in obstruction and deceitfulness at his trial like Mock did at his. Accordingly, Mock deserves a higher sentence than Fitzsimons received.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Mock was convicted of a violation of an offense under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take

31

account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Mock to pay $2,000 in restitution for his convictions on Counts 1-11. This amount fairly reflects Mock's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 109 months of imprisonment, three years of supervised release, $2,000 in restitution, and the mandatory $710 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   */s/ Michael M. Gordon*
MICHAEL M. GORDON
Senior Trial Counsel, Capitol Siege Section
Assistant United States Attorney
Florida Bar. No. 1026025
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
michael.gordon3@usdoj.gov
(813) 274-6000

*/s/ Michael L. Jones*
MICHAEL L. JONES
Trial Attorney, Detailee
D.C. Bar No. 1047027
601 D St., NW

33

Washington, D.C. 20001
michael.jones@usdoj.gov
(202) 252-7820