## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRIAN MOCK,<br><br>    Defendant. | Crim. No. 21-444 (JEB) |

### MEMORANDUM IN AID OF SENTENCING

I.    **Introduction**

Brian Mock traveled to the "Stop the Steal" rally because he wanted to express his concerns about whether there were irregularities in the election that had occurred. He had heard much that suggested the election was not free and fair and he wanted a full and complete investigation, something he believed had not occurred. He has never been affiliated with any extremist group and was not particularly politically minded before 2020, but he had very strong views in the aftermath of the 2020 election.  His postings on Facebook were hyperbolic, like many social media users, but were not indicative of his intent that day. Was he concerned violence might erupt? Yes. Did he intend or hope for it?  No. He came to D.C. with two other individuals and they began the day as many did, sightseeing and visiting the rally. He then joined everyone else that walked toward the Capitol. To his credit, he never entered the Capitol building. While he sent messages about his actions in the immediate aftermath that may have seemed to be boasting about his activities, having reflected upon those actions over the last two years, he deeply

regrets his actions that day, as is evidenced by the letter he has submitted. (Exh. 1). Counsel will not comment extensively on the facts as were found by the Court at the trial for two reasons. First, the Court and everyone else involved in the sentencing hearing was there, while Counsel was not. Even more importantly, Mr. Mock, having been convicted at trial, has a right to appeal that conviction and thus is someone constrained in what he can and should say at this point.

Mr. Mock has experienced severe consequences for his actions and is prepared to accept the further consequences that this Court will mete out. After his arrest, he was held in custody for nearly a year on what he continues to maintain were misrepresentations by the government. After this Court released him, he was on stringent conditions with which he consistently complied. So much so that pretrial services suggested removing some of those conditions. Even after removal of the most stringent conditions, he has been fully compliant. As the letters submitted on his behalf note, he is not the same person as he was upon his arrest or even his release from custody. He has grown, matured, and become much more self-reflective.

Moving forward, and for the rest of Mr. Mock's life, his felony conviction in this high profile matter will disrupt his ability to obtain employment and has caused him to lose other privileges and liberties afforded to all citizens. Indeed, no matter what sentence this Court imposes, Mr. Mock will continue to experience the ripple effects of his destructive lack of judgment for the rest of his life.

While Mr. Mock went to trial, he did so not because he believed he did nothing wrong, but because he didn't believe that all of the charges the government was bringing were correct. He was willing to accept a plea offer to what he believed he did but was not willing to admit to conduct or intentions that he did not have. He knows that he must be punished for his role in what transpired on January 6, but he submits that the sentence requested by the government and probation, even with the variance proposed by the Probation Office, is more than that which is necessary to meet the statutory purposes of sentencing, especially in light of sentences imposed on other individuals charged who engaged in similar and often more egregious conduct and his lengthy time in harsh pretrial detention based upon erroneous information.

## II.   Procedural History

This case has a somewhat convoluted procedural history. Mr. Mock was arrested on June 11, 2021, in Minnesota. He was ordered released in that district, but the government appealed and Judge Howell, then serving as Chief Judge, ordered the release stayed pending a further hearing. A hearing was held by videoconference on June 22, and on June 29, Judge Howell ordered Mr. Mock detained and transported to the District of Columbia. He was subsequently indicted on June 30, 2021. A superseding indictment was filed on December 1, 2021[1].

---

[1] At the time of the earlier proceedings, Mr. Mock was represented by former AFPD Keala Ead from the District of Minnesota, first as counsel of record and subsequently as standby counsel. In February, Mr. Ead filed a motion to withdraw as standby counsel which was granted. Mr. Mock then hired counsel, Mr. Shipley to represent him. A potential conflict arose while Mr. Shipley was negotiating a plea for Mr. Mock which caused him to withdraw and new counsel to be appointed – this time a CJA attorney from Minnesota. That attorney represented Mr. Mock as counsel of

On May 24, 2022, Mr. Mock's motion for release was granted and he was released to the third-party custody of Richard and Betsy Mock with stringent release conditions including GPS monitoring and a curfew. While there were a few minor issues in his initial adjustment, he subsequently has been in complete compliance with his release conditions and in fact, those conditions have been modified to lesser conditions over time. On February 13, 2023, GPS monitoring and the curfew were removed.

On March 15, 2023, an 11-count second superseding Indictment was filed charging Mr. Mock with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 USC §1512(c)(2) and (2) (Count One); Civil Disorder, in violation of 18 USC § 231(a)(3) (Count Two); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC §111(a)(1) (Counts Three, Four, and Six); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 USC § 111(a)(1) and (b) (Count Five); Theft of Government Property, in violation of 18 USC § 641 (Count Seven);Entering and Remaining in a Restricted Building or Grounds With a Deadly or Dangerous Weapon, in violation of 18 USC §§ 1752(a)(1) and (b)(1)(A) (Count Eight); Disorderly and Disruptive Conduct in a Restricted Building or Grounds With a Deadly or Dangerous Weapon, in violation of 18 USC §§ 1752(a)(2) and (b)(1)(A) (Count Nine); Engaging in Physical Violence in a Restricted Building or Grounds With a Deadly or Dangerous Weapon, in violation of

record until Mr. Mock requested mid-trial to represent himself, at which time, his CJA counsel became standby counsel. After trial, Mr. Mock requested that undersigned counsel be appointed to represent him for sentencing.

18 USC §§ 1752(a)(4) and (B)(1)(A) (Count Ten); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 USC §5104(e)(2)(F) (Count Eleven).

Mr. Mock proceeded to trial on this second superseding indictment, and on July 12, 2023 was convicted on Counts One through Eleven by the Court following a bench trial.  The Court found him guilty only of the unenhanced lesser included offenses for Counts 5, 8, 9 and 10, i.e., dismissing the enhancement for deadly or dangerous weapon. Mr. Mock now comes before this Court for sentencing on these charges. He has a number of objections to the Presentence Report and requested a stay in these proceedings until after the Supreme Court resolves the 1512 appeal now pending there.  *United States v. Fischer*, 64 F.4d 329 (D.C. Cir. 2023), *cert. granted*, No. 23-5572, 2023 WL 8605748 (Dec. 13, 2023). This Court denied that request earlier today and Mr. Mock therefore submits this sentencing memo.

### III.    Objections to the Presentence Report and Grounds for Variance related to the Sentencing Guidelines

### A. Factual Disputes

Because there was no plea and Mr. Mock proceeded to trial, there is no agreement as to the factual allegations. Mr. Mock has objected to the Probation Office's recitation of the facts which was provided by the government and is not consistent with Mr. Mock's recollection of either the events or the facts proven at trial. The Probation Office has declined to review the defendant's specific objections and has simply noted the general objections and that "the defendant goes on to cite various examples of disputed conduct Given that the trial court is in the best position to determine what facts were presented or proven at trial, no requested

5

edits were made to the PSR pending the Court's ruling on these issues." Thus, the defense includes these specific factual disputes for the Court:

Paragraph 16: Mr. Mock disputes that comment that "he was prepared to use force to do so." He was not.

Paragraph 17: Mr. Mock disputes that he believed Joe Biden, Nancy Pelosi and the Democrats should be branded socialists and tyrants and thought that a violent mass uprising was necessary to keep them from taking power. He believed there were irregularities in the election that should be investigated.

Paragraph 18: Mr. Mock objects to the inclusion of this paragraph as being a conglomeration of bits of statements that mischaracterize his beliefs.

Paragraph 19: Mr. Mock did not "recruit" anyone. Ms. Visnovec and Mr. Finnigan asked to attend. Mr. Mock did not expect to participate in violence but was concerned there might be violence between protesters and counter-protestors.

Paragraph 22: Mr. Mock applauded when a wooden post was caught by an officer.

Paragraph 23: Mr. Mock reached down to towards the officer, he did not intentionally push him down. He does not recall intentionally kicking or attempting to kick Officer Collins.

Paragraph 24: A member of the crowd hit Mr. Mock in the head with a flagpole from behind and he grabbed the flagpole and threw it down. He did not intentionally

hurl it toward police officers, although he acknowledges that that is where it ended up.

Paragraph 25: Mr. Mock was pushed from behind, as a result, he pushed someone in the back and that may have been a police officer, but it was not done because he was a police officer.

Paragraph 26: Mr. Mock maintains that he believed Officer Karlsen said he would "shoot". In response, he acknowledges that he pushed his shield and Office Karlsen then slipped on another shield on the ground.

Paragraph 27: Mr. Mock disputes that he pursued officers as they retreated or that he intended to assist others in using shields as weapons.

Paragraph 28: Mr. Mock picked up a home-made baton or sorts from the ground but as far as he knows, it was not a police issued baton. He did not carry the baton with an intention to use it as a weapon as is evidenced by the fact that he did not use it as a weapon at any point.

Paragraph 29: Mr. Mock was not "boasting" when he made the comments cited in this paragraph, although he acknowledges that it may have seemed that way.

**B. Objections to the PSR's Guidelines Calculation**

**Paragraphs 32-34 and the Obstruction enhancement**: Mr. Mock does not agree that he intentionally provided materially false testimony under oath. He testified to the best of his ability about his recollections of the day. He acknowledges that the Court found facts that were different from his recollections, but that does not

mean that he intentionally provided false testimony. And in fact, the Court noted that it found much of want he said to be credible. Tr. at 3. Nevertheless, Mr. Mock acknowledges that the Court did not credit everything he said.  Part of this was simply Mr. Mock not being as clear as he thought was in explaining things during his testimony. An example of that is when the Court apparently contradicting himself by suggesting he didn't know the certification was happening on January 6, then later admitted he did. In fact, Mr. Mock was only explaining that he didn't know it before the December rally but did by January 6. He was not intentionally trying to mislead the Court.

### Enhancements in the Various Groups

With respect to Group One, Mr. Mock objects to the inclusion of the eight-level enhancement for the specific offense characteristic of using the flagpole as a spear. Mr. Mock tossed the flagpole – he did not use it to cause or threaten physical injury in an effort to obstruct the administration of justice. Moreover, this Court dismissed the enhancement for use of a dangerous weapon at the trial and proceeded only on the lesser included offenses for counts 5 and 8-10, thus making it particularly inappropriate to add the enhancement here. As this Court noted, while some flagpoles may qualify as a dangerous weapon, this lightweight piece of a flagpole used in this manner, did not. Mr. Mock further objects to the 3-level enhancement for substantial interference with the administration of justice and the 2-level enhancement for obstruction of justice. The total offense level for group one should be 14.

With respect to Group Two (Collins), Mr. Mock objects to the inclusion of a 6-level enhancement for substantial risk of serious bodily injury and a 2-level enhancement for obstruction of justice. The total offense level for group 2 should be 14.

With respect to Group Three (Karlsen), Mr. Mock objects to the inclusion of a 6-level enhancement for substantial risk of serious bodily injury and a 2-level enhancement for obstruction of justice. The total offense level for group 3 should be 14.

With respect to Group Four (Unidentified Officer), Mr. Mock objects to the inclusion of a 3-level enhancement as his actions were not motivated by the officer's status and the 2-level enhancement for obstruction of justice. The total offense level for group 4 should be 14.

With respect to Group Five, Mr. Mock objects to the 2-level enhancement for obstruction of justice. The total offense level should be 6.

Thus, the combined total offense level is 17, with a guideline range of 24-30 months.[2]

**The aggravated assault guideline, USSG § 2A2.2, does not apply to any count.**

The PSR is incorrect to apply the aggravated assault guideline to Counts 2-6 (Civil Disorder and 111(a)). The appropriate guideline is 2A2.4 as this was not an aggravated assault as defined by the sentencing guidelines. USSG § 2A2.4(c) only

---

[2] If guideline 2A2.4 is used, the offense level for each of groups 1 through 4 would be 13, resulting in a combined offense level of 16 and a guideline range of 21-27 months.

notes that a defendant convicted of assaulting a federal officer under 18 U.S.C. § 111 should be sentenced under §2A2.2, if the defendant's conduct constituted aggravated assault.[3] Mr. Mock's conduct did not constitute aggravated assault. The commentary to the aggravated assault guideline defines aggravated assault as

> a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony. Cmt.

This does not apply to Mr. Mock's conduct.

The application of the three-level enhancement under §2J1.2(b)(2) and the 8-level enhancement under § 2J1.2(b)(1)(B) are inappropriate because his offense did not involve the "administration of justice" as a matter of law. Moreover, Mr. Mock did not   cause or threaten to cause physical injury to a person in order to obstruct the administration of justice. Therefore, this enhancement does not apply as a factual matter. *See* U.S.S.G. §2J1.2(b)(1)(B) ("If the offense involved causing or threatening to cause physical injury to a person, or property damage, *in order to obstruct the administration of justice*, increase by 8 levels.") (emphasis added).[4]

Nor does the "substantial interference" specific offense characteristic apply as a factual matter. The comments to the Guidelines addressed what constitutes a

---

[3] "Aggravated Assault" is defined in §2A2.2 application note 1. *See U.S. v. Hooker*, 997 F.2d 67, 39 Fed. R. Evid. Serv. 443 (5th Cir. 1993) (pointing a cocked and loaded firearm at the victim's head, while kicking him and deciding where to kill him, constitutes aggravated assault as to trigger §2A2.2)

[4] Mr. Mock's objection relies in part on the analysis in *United States v. Seefried*, 639 F. Supp.2d 8 (D.D.C. 2021).

"substantial interference" with the administration of justice. Notably, each example in the commentary describes a situation in which the defendant materially affected the *outcome* of the obstructed proceeding; for example, a prematurely terminated investigation or indictment procured through perjury. U.S.S.G. §2J1 cmt. n. 1. Here, Mr. Mock's actions had no causal relationship with the outcome or duration of the joint session. He did not encounter legislators or staff. He did not step foot in the Senate Chamber or even the Capitol building when Congress was meeting or at all. Therefore, even setting aside the issue as to whether the conduct involved "administration of justice," the specific offense characteristics do not apply.

### Official Victim Enhancement

Even if a 6 level enhancement is applied pursuant to U.S.S.G § 3A1.2 because the victim was a government official, consideration of a variance is appropriate because that enhancement typically applies when there is an animus towards a government official. Mr. Mock was not predisposed to be motivated by the officer's status but reacted to the violence around him.

The applicable guideline provides in full: (Apply the greatest):

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the *offense of conviction was motivated by such status*, increase by 3 levels;

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by 6 levels.

(c) If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable – (1) knowing or having reasonable cause to believe that a person

11

was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom; or (2) knowing or having reasonable cause to believe that a person was a prison official, assaulted such official while the defendant (or a person for whose conduct the defendant is otherwise accountable) was in the custody or control of a prison or other correctional facility, increase by 6 levels. U.S.S.G § 3A1.2. (*Italics added*)

In the commentary, the Commission explains in pertinent part that "motivated by such status," means that the offense of conviction was motivated by the fact that the victim was a government officer or employee. *Id*. cmt. n.3. The Commission goes on to provide an example "where both the defendant and the victim were employed by the same government agency and the offense was motivated by a personal dispute." *Id*.

A 6 level increase would be dramatic, and its application in this case would over emphasize the importance of the victim's status in the actions taken. Thus, a variance is warranted.

### Zero Point Offender Status

As this Court is aware, recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Mr. Mock has no criminal history points and thus requests that the Court apply this two-level decrease. The Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. Sent'g Comm'n, Recidivism Of Federal Offenders Released In 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.  Additionally, U.S.S.G. § 5C1.1 has been amended with a new application note

providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. In this case, in light of the fact that Mr. Mock is not likely to recidivate, the same justification suggests a variance even if the Court does not find that USSG 4C1.1 applies.

Regardless of the guideline range this Court calculates, Mr. Mock, through counsel, respectfully submits that, consistent with the principle articulated by the Supreme Court that "the punishment should fit the offender and not merely the crime," *Pepper v. United States*, 562 U.S. 476, 477 (2011), this Court should impose a sentence well below the guidelines, followed by a period of supervised release with those conditions the Court sees fit to impose.

## IV.    Application of the Sentencing Factors

### A.    Mr. Mock's history and characteristics demonstrate that a below guidelines sentence is appropriate.

Mr. Mock was born in 1979. His parents reside in Northern Virginia where he was born and raised. He has five siblings, but is no longer close to his family, due in large measure to childhood difficulties as noted in the PSR, but also due to the stress of this incident.  He has four children – all boys, ages 21, 15, 12 and 10 from two prior marriages. The boys live with their mothers and are in school. Prior to his arrest in this case, Mr. Mock had joint custody of his sons. While his arrest in this case caused a disruption, he has since reengaged with his children and is working on repairing their relationship.  He is now engaged to a woman he has been involved with since

13

December of 2022. They live together in New Richmond, Wisconsin, and she is employed as an Information Technology (IT) consultant.

Mr. Mock has a history of employment and is currently the owner of his own business. When he was arrested, Mr. Mock lost his job as the Vice President of a landscaping business out of Buffalo, Minnesota. However, after he was released on pretrial release, he started his own company, Dynamic Landscaping Solutions LLC, which became licensed in March of 2023. His business is thriving. Any period of incarceration will necessarily require him to start anew again.

Mr. Mock would describe himself as politically aware, but not politically active. He has always had a degree of skepticism about the government and that increased in and around 2020. He is not an idealogue but rather is someone with firm beliefs that are on both sides of the political spectrum. He acknowledges that in 2020 he engaged in internet trolling and got caught up in the political heat of the time. In December 2020, after the election, Mr. Mock had recently broken up with his girlfriend and had just started dating the woman who came with him and a friend to D.C. They decided to come to the Stop the Steal Rally. He had watched the election returns in Wisconsin and believed there were irregularities. He listened to politicians like Mo Brooks who spoke about election integrity and fraud and he believed there were problems with the election. He believed that elected officials had the obligation to review what had occurred. So, when he started hearing that Congress could send the election back to the states, he wanted to support that effort. So, as he acknowledged in his testimony, he used social media to encourage people to attend.

14

He didn't go looking for violence, but he expected there would be counterprotests which could turn violent. He didn't bring weapons or protective gear – he wore street clothes, a hoodie he bought that day, work gloves, and a hat. He carried granola bars and water in his backpack. At the time, he didn't know he couldn't be on the Capitol grounds – although he recognizes now that as he approached the Capitol and saw the OC spray and the smoke and injured people, he should have realized he wasn't supposed to be there. At the time he was focused on certain areas that were obviously off limits like the scaffolding, but thought protests were allowed in other areas. He didn't go into the building, knowing that was not allowed. In hindsight, he recognizes that should have been enough to cause him to leave, but as he acknowledges, he didn't. He moved with the crowd even as he witnessed violence between the police and other individuals. There was a lot of confusion and chaos and in that confusion, he acknowledges making a series of mistakes and reacting poorly. As Mr. Mock acknowledged during his closing argument, he did "a lot of stupid things." Tr. 161. He said he was "sorry and embarrassed for a lot of the things that went down that day" and that he was "sorry for being a part of it." Tr. 164.

Mr. Mock has already served nearly a year in pretrial custody and another year and a half on pretrial release.  During that time, Mr. Mock has demonstrated his ability to comply with release conditions and has turned his life around. Mr. Mock has no significant criminal history and no criminal history points.

**B. The nature and circumstances of the offense are serious but do not warrant the sentence the government requests.**

A below guidelines sentence would be sufficient to reflect the seriousness of the offense and provide just punishment, especially in light of the lengthy time Mr. Mock spent in pretrial custody and the lengthy time he has been under significant pretrial conditions. A lengthy period of incarceration would be overly punitive when other methods of punishment are available.

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[5]

Following any term of incarceration, Mr. Mock will continue to be monitored on supervised release with restitution obligations, which, to be clear, are in and of themselves forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of supervised release."); *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"); *see also United States v. Cohen*, 459 F.3d

---

[5] Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg 29.

490, 496 (4th Cir. 2006) ("[R]estitution is […] part of the criminal defendant's sentence.").

Mr. Mock's year in pretrial custody, with almost 6 months in solitary confinement, and 9 months on home confinement before having GPS monitoring removed, and his continued compliance with his release conditions over the past additional year since, coupled with either a short term of incarceration or with an extended period of supervision with a condition of home incarceration, in addition to the collateral consequences he has and will continue to experience, together constitute a sentence that meets the goals of 3553(a).

The collateral consequences that attend to Mr. Mock's felony conviction cannot be overstated. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29. Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These

restrictions amount to a form of civil death and send the unequivocal
message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 (internal quotations, alterations, and citations omitted).

In *Nesbeth*, the defendant was also a first offender, convicted of importation of

drugs. Though that defendant's guideline range was 33-41 months, Judge Block

"rendered a nonincarceratory sentence. . . in part because of the number of

statutory and regulatory collateral consequences in balancing the 18 U.S.C. §

3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir.

2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty

months in part because conviction "made it doubtful that the defendant could

pursue his career as an academic or translator, and therefore that the need for d

further deterrence and protection of the public is lessened because the conviction

itself already visits a substantial punishment on the defendant"); *United States v.

Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching

certificate and his state pension as a result of his conduct" is appropriate sentencing

consideration consistent with requirement that "the sentence reflect the need for

just punishment and adequate deterrence").

The collateral consequences that Mr. Mock has already experienced and will

continue to experience are severe and should be considered by this Court in

assessing what would constitute a "just punishment" and "adequate deterrence."

With respect to deterrence, it is often presumed that incarceration is

necessary to achieve deterrence, and that the more incarceration imposed, the

greater the deterrent effect. However, research has consistently shown that while

the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[6] In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Mock or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

---

[6] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

C. **A sentence below what the government is seeking would avoid unwarranted disparities.**

With respect to promoting respect for the law, a sentence below what the government has requested will promote respect for the law. Similarly situated January 6 cases have received considerably less in most, but not all, cases. A sampling of the most serious cases with similar conduct follows:

- *United States v. Sargent*, 21-cr-258 (TFH): Sargent pleaded guilty to assault on a police officer (111a) and civil disorder (231), among other charges, and was sentenced to 14 months incarceration when the government requested 27 months. In addition to twice swinging at an officer, he recorded the scene on social media while boasting, "we got a clash of police going. . . Shit's getting fucking rowdy out here now. We got flash bangs."[7] After striking one officer, Sargent tried to strike another officer, but instead made contact with another protestor. At one point, that defendant bragged that he "duffed an officer in the face." He also told officers "fuck you guys, you guys are either with them or with us and repeatedly berated officers." After the riot, he repeatedly gleefully bragged about punching an officer. After his arrest, he lied to the FBI about his actions.[8]

- *United States v. Leffingwell,* 21-cr-5 (ABJ): Leffingwell, a 57 year old veteran who entered the Capitol at the Senate wing doors and chanted

---

[7] *United States v. Troy Sargent*, 1:21CR258(TFH), Gov. Sentencing Memo, ECF. No. 70.
[8] *Id.*

at officers standing before him to "join us" and then, when two officers tried to repel him and the crowd around him, struck both officers in the head, landing three blows, pleaded guilty to assault (111a) and was sentenced to 6 months when the government sought 27 months.[9]

- *United States v. David Blair*, 21-cr-186 (PLF): Blair, who carried a large confederate flag and a backpack containing a knife and duct tape, and pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands, pleaded guilty to civil disorder (231) and was sentenced to five months.[10]

- *United States v. Robert Palmer,* 21-cr-328 (TSC): Palmer pleaded guilty to assault (111b) and was sentenced to 63 months after repeatedly assaulting police officers throwing a wooden plank like a spear, spraying officers with a fire extinguisher which he later threw at them, and then attacked again, with a piece of scaffolding and a second fire extinguisher as well as a traffic cone.  (His sentencing range was 63 to 78 months rather than 46 to 57 months because he lost his credit for acceptance of responsibility after posting false narratives about January 6 on his fundraising website.)[11] Most importantly, he was convicted of 111(b) not 111(a) like Mr. Mock.

---

[9] *United States v. Leffingwell,* 1:21CR5 (ABJ), ECF. No. 4.
[10] *United States v. David Blair*, 1:21CR186 (PLF), ECF. No. 55.
[11] ECF 30, Government Sentencing Memorandum.

- *United States v. Devlyn Thompson*, 21-cr-461 (RCL): Thompson pleaded guilty to assault (111b) after exhorting officers to fight one on one, passing out riot shields to rioters encouraging them to use the shields as weapons against the officers, throwing a large box speaker at the police line, assaulting a police officer with a metal police baton, and remaining in the tunnel for more than 13 minutes. He was "among the first of the rioters to arrive on the inaugural stage and he was one of the last to leave. For these numerous assaults over an extended period, he was sentenced to 46 months when the government requested 48 months.[12] Again, he was convicted of 111(b), not 111(a).

- *United States v. Nicholas Languerand*, 21-cr-353 (JDB): Languerand, an individual who had prior assaultive and threatening conduct, pleaded guilty to assault (111b) after watching the violence for two hours before assaulting officers by throwing a piece of wood, a heavy black speaker, multiple sticks, and a large traffic cone, using a riot shield against the officers, and later bragging about and offering justifications for his violent acts, and was sentenced to 44 months when the government requested 51 months. Languerand also had an extensive arsenal when he was arrested, as well as writings deeply critical and menacing of the FBI and photos of the proud boys, three percenters, nazi iconography, etc. He posted that he had carried a

---

[12] ECF 30, Government Sentencing Memorandum.

firearm with him to the Capitol although there was no evidence that this was true.[13] Again, 111(b), not 111(a)

- *United States v. Scott Fairlamb,* 21-cr-120 (RCL); Fairlamb pleaded guilty to assault (111b) and obstruction after entering the Senate Wing one minute after it was breached, screaming at the officers, armed with a police baton which he brandished. He shoved an officer and punched him in the face.  He shoved the officer so hard that he fell into a line of rioters, after which he stuck his finger in the officer's face and punched him in the face shield.[14] After January 6, he both lied about and bragged about his activities. He was sentenced to 41 months when the government requested 44 months. Again, 111(b), not 111(a).

- *United States v. Thomas Webster,* 21-208 (APM): Webster, a former marine and police officer, was found guilty of five felony counts including assault (111b) and civil disorder (231) among other charges after a trial and was sentenced to 120 months when the government sought 210 months. Webster brought a bulletproof vest and weapon with him to the District of Columbia and wore that vest and carried a metal flagpole at the Capitol. He shouted obscenities at the officers, "you fucking piece of shit. You fucking commie motherfuckers, man. You wanna attack Americans? No, fuck that" and tried to provoke a fight. He then wielded his flagpole as a weapon, swinging it with

---

[13] ECF 34, Government Sentencing Memo.
[14] ECF 50, Government Sentencing Memo.

enough force to break it in half. He then charged directly at one of the officers tackled him to the ground, and dragged him by his helmet, pinning him to the ground and attempting to rip off his gas mask. He restrained him on the ground while others kicked him. He subsequently bragged about his misconduct and obstructed justice by deleting photographs he had taken. During his trial, rather than express remorse, he villainized the officers he had attacked.[15] His conduct was far more serious and he was convicted of 111(b) not 111(a).

- *United States v. Duke Wilson,* 21-cr-345 (RCL): Wilson pleaded guilty to obstruction (1512) and assault (111a) and was sentenced to 51 months. He physically engaged in hand to hand combat with officers at the Lower West Terrace, punching, shoving and kicking them as well as trying to steal their riot shields. He then picked up a several feet long PCV pipe and struck at the officers, striking at least two different officers, and threw it into the crowd of officers. Despite these actions, the government allowed Wilson to plead guilty to 111(a) which did not include holding him responsible for the assault with the PVC pipe as a dangerous weapon.[16]

- *United States v. Kevin Douglas Creek,* 21-cr-645 (DLF): Creek, a former Marine who brought mace and a knife to the Capitol, pleaded guilty to

---

[15] ECF 104, Government Sentencing Memo.
[16] ECF, Government Sentencing Memorandum

assault (111a) after he pushed through the barricade and grabbed Officer JCM driving him back forcefully several feet, striking him in the face shield before letting him go (arguably a physical restraint) and shoved Officer RSE to the ground and kicked him. He also picked up a ratchet strap – a thick strap with heavy metal buckles and threw it at the officers.[17] He was sentenced to 27 months, the government's request.

- *United States v. Matthew Miller*, 21-cr-75 (RDM): Miller pleaded guilty to assault (111a) and obstruction (1512) after he threw beer cans and batteries at officers, and unleashed the contents of a fire extinguisher on more than a dozen officers as other rioters were assaulting them (the same fire extinguisher later thrown at officers by Palmer). He was sentenced to 33 months.[18]

- *United States v. Greg Rubenacker,* 21-cr-193 (BAH): Rubenacker pleaded guilty without a plea agreement to all ten counts, including obstruction (1512), civil disorder (213) and assault (111a) among other charges, and was sentenced to 41 months. According to the government, he was one of the first people to enter the Capitol, entered a second time after leaving, chased Officer Goodman through the

---

[17] ECF 48, Government Sentencing Memorandum
[18] ECF 67, Government Sentencing Memorandum

Capitol, berating him and other officers, swung a water bottle at one officer's head and threw liquid on another officer.[19]

- *United States v. Alan Byerly* 21-cr-257 (RDM): Byerly was charged with assault (111b) for assaulting several officers with a Taser, but pleaded guilty to assault (111a) and striking another person (113) for assaulting a reporter. According to the government, Byerly engaged in three separate assaults-- he activated a stun gun on one police officer and when it was taken by officers, he physically struck them and pushed against them, grabbing an officer's baton, he assaulted a group of officers using an enormous all metal Trump billboard with sharp edges that was capable of splitting someone's head open as a battering ram and viciously assaulted a member of the press, dragging him up and down the staircase. As the government described it, "Byerly grabbed the victim with both hands near the victim's shoulder and upper chest and pushed him backward. Byerly then pushed and dragged the victim past the site of the original altercation and towards a dense crowd. Byerly eventually placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall that separated the stairs of the West Front of the Capitol Building from the west lawn below." No weapon enhancement under 111b applied. The

---

[19]  ECF 56, Government Sentencing Memorandum

government requested a sentence of 46 months and he was sentenced to 34 months.[20]

- *United States v. Cody Mattice and James Mault,* 21-cr-657 (BAH): Mattice and Mault pleaded guilty to assault (111a) after planning and preparing for violence before coming to D.C., bring chemical spray and batons with them, pulling down a section of the bike rack fencing and leading the attack on the west plaza and later body-surfing over other rioters to enter the Lower West Terrace tunnel; both also used a chemical spray against the officers. Both Mault and Mattice lied about their actions that day with Mattice claiming that he was using the chemical spray against protesters in support of the police. Both avoided the 111(b) charge by being given the opportunity to plead to 111(a) despite their actions; each was sentenced to 44 months.[21]

- *United States v. Howard Richardson*, 21-cr-721 (CKK): Richardson bludgeoned a police officer three times with a long metal pole he brought to the Capitol, only stopping when it broke; less than 2 minutes later, he helped use an enormous metal Trump sign as a battering ram against police officers. He was sentenced to 46 months. There were however aggravating factors – he was on bail for illegal possession of a firearm on January 6; he made false representations to the Court during his plea hearing; and after his plea but before

---

[20] ECF 46, Government Sentencing Memorandum.
[21] ECF 60 and 61, Government Sentencing Memoranda.

sentencing he was arrested again for aggravated assault and lied to the local police about his conduct.[22]

- *United States v. Ricky Wilden,* 21-cr-423 (RC); Wilden, a member of the Proud Boys, assaulted numerous police officers with a chemical irritant while he wore goggles that he had brought with him and then threw the canister at the officers; he entered the Capitol. After January 6 he deleted Facebook messages and videos.[23]  He pleaded guilty to assault (111a) and the government sought 30 months. At the time of his sentencing, he had a pending charge for felony assault of his spouse with a deadly weapon and was using illegal substances while on release. Despite assaulting with a chemical irritant and the empty canister, he was not required to plead to the more serious assault charge and did not receive the dangerous weapon enhancement. He was sentenced to 24 months.

- *United States v. Marshall Neefe,* 21-cr-567-1 (RCL): Neefe pleaded guilty to obstruction (1512) and assault (111a) after he made plans to obstruct congress and then helped use the enormous (8 feet tall and 10 feet wide) metal Trump sign as a battering ram against police officers, then entered the Capitol building, pleaded guilty to assault (111a) and obstruction (1512). According to the government, prior to January 6, Neefe had shared his intention to bring weapons and commit violence.

---

[22] ECF 35, Government Sentencing Memo.
[23] ECF 36, Government Sentencing Memo.

He admitted to making a wooden club with an American flag stapled to it to use as a potential weapon. Government requested sentence of 46 months (didn't include the weapon enhancement under 111b) and Neefe was sentenced to 41 months.[24] After the attacks, he celebrated his involvement.

- *United States v. Mark Mazza,* 21-736 (JEB): Mazza, a veteran, pleaded guilty to assault (111b) and CPWL after he brought two loaded handguns with him to the Capitol. While armed with one of his guns (he apparently lost the other in the crowd and it was subsequently recovered from another rioter who assaulted an officer), he pushed against the officers in the tunnel, berated and assaulted officers with a stolen police baton and remained armed on the Capitol grounds for several hours. "With his left hand, Mazza struck with full force against MPD Officer P.N.'s ungloved hand." He then showed off his stolen baton and engaged in the "heave-ho" pressure while brandishing the baton against police in the tunnel. After he left, he engaged in numerous acts of obstruction including filing a false police report about how he lost his gun, filing off the serial number of the stolen police baton, and providing false information to the capitol police.[25] The government sought a sentence of 78 months citing the egregiousness of his acts, and he was sentenced to 60 months.

---

[24] ECF 84, Government Sentencing Memo
[25] ECF 30, Government Sentencing Memo.

- *United States v. Mark Ponder,* 21-cr-259 (TSC): Ponder pleaded guilty to assault (111b) and was sentenced to 60 months. According to the government, Ponder charged at an officer with a long thin pole, swinging it aggressively at him such that it broke. Moments later he returned with a thicker, sturdier pole and again repeatedly struck another officer. Again, approximately 10 minutes later, he swung that same pole like a baseball bake at Officer JC, striking him in the left shoulder. He was then arrested, but released with instructions to leave when no transport was available. Instead, he returned to the lower west terrace where he used a police shield against the officers. He remained on capitol grounds until at least 5 pm. According to the government, Ponder had an extensive criminal history, including crimes of violence, resulting in a sentencing guideline range of 57 to 71 months.[26]

- *United States v. Charles Bradford Smith,* 21-cr-567-2 (RCL): Smith pleaded guilty to obstruction (1512) and assault (111a). According to the government, he conspired with codefendant Neefe for two months to obstruct the certification of the election, planned and prepared for violence, and once there, assisted in hoisting the large metal Trump sign (described above) and used it as a battering ram assaulting at

---

[26] ECF 54, Government Sentencing Memorandum

least  three police officers; sentenced to 41 months when government sought 44 month sentence.[27]

- *United States v Sandlin,* 21-cr-88 (DLF) Sandlin pleaded guilty to assault (111a) and obstruction (1512k) and was sentenced to 63 months. According to the government, Sandlin with his coconspirators DeGrave and Colt, substantially planned for their participation, bringing a car full of weapons, including knives, bear spray and a pistol fully anticipating violence; Sandlin then directly assaulted at least 2 capitol police officers – attempting to rip off one officers helmet and taking a swing at another officer's head and assisted in the assault of at least 4 others, then, in the aftermath both celebrated his participation and tried to profit off of it and obstructed the investigation.[28]

- *United States v. Hernandez,* 22-cr-42 (CRC): Hernandez pleaded guilty to assault (111a) and civil disorder (231) after he climbed through the window at the Senate Wing Door, entered the speaker's conference room and senate gallery, he hit a door in the hallway with his flagpole, and attempted to enter where congressional staff were barricaded in an office, he then assaulted a police officer with his flagpole by hitting

---

[27] ECF 90, Government Sentencing Memorandum
[28] ECF 92, Government Sentencing Memorandum.

him in the head.[29] The dangerous weapon enhancement was not
applied and he was sentenced to 24 months.

- *United States v. Douglas Jensen,* 21-06 (TJK) was found guilty after
  trial before a jury of assault (111a), civil disorder (231) obstruction
  (1512) and other assorted misdemeanors and was sentenced to 60
  months, after he entered the Capitol in the first wave and led a group
  of rioters menacingly chasing Officer Goodman towards the Senate
  Chamber, breached the Capitol a second time after exiting, and
  repeatedly riled up the crowd and threatened officers, while carrying a
  knife in his pocket. As officers tried to escort him out, he pushed and
  shoved them in a very agitated state.

- *United States v. Philip Young,* 21-617 (DLF) Young pleaded guilty to
  all charges, including assault (111a) and civil disorder (231) without a
  plea agreement. The government requested a sentence of 40 months
  and he was sentenced to 8 months. Early on in the breach, Young
  rushed up the stairs, grabbed and lifted a barricade and pushed it into
  two MPD officers; after being forced back down the stairs, he pushed
  the barricade forward against the officers a second time. The
  government sought a dangerous weapon enhancement for the bike
  rack, but it appears the Court did not agree.[30]

---

[29] ECF 32, Government Sentencing Memorandum.
[30] Counsel does not have access to the transcript and is making this assumption based upon
the sentence ultimately imposed.

- *United States v. David Judd,* 21-cr-40 (TNM): Judd was found guilty after a stipulated trial of obstruction (1512) and assault (111a). According to the government, Judd was fully aware of the certification process, intended to disrupt the activities of Congress before coming to D.C., and "acted as an on-the-ground commander of other rioters, directing, encouraging, and instigating the violence, chaos, and destruction in and around the tunnel . . . yelling commands to organize rioters, passing items into the tunnel to be used as weapons" etc. He then joined in coordinated pushes against the police line and lit a firecracker and threw it at the police line.[31] The government characterized his conduct as "some of the most aggravating conduct that we've seen on January 6th."[32] The firecracker was found to be a dangerous weapon, and the Court found that Judd intended to cause bodily injury by throwing the firecracker, but the Court disagreed with the guideline range of 78 to 97 months proposed by the government and probation and found a range of 37 to 46 months and then varied downward to impose a sentence of 32 months, finding the "advisory guideline produces an advisory sentence that is overly harsh." [33]

---

[31] ECF 527, Government Sentencing Memorandum.

[32] Transcript at p. 17. See also, Transcript at 26 (seeking a terrorism enhancement, the government represented 'the degree of his conduct was so great, and his intent was there so great, coupled with all of his other actions in the tunnel, which include directing the rioters, passing the shields in, passing the crutch in, telling people were to go, engaging in the heave-ho himself, this Defendant did it all, and he did it over the course of a long period of time."); Transcript at 53 ("looking at all of the January 6 rioters, I think this Defendant is at the high end of them also.)

[33] Transcript of Sentencing. The Court found the guideline range to be lower because of its reading of the 1512 guidelines.

The government requested a sentence of 90 months and he was sentenced to 32 months.

- *United States v. Lucas Denney,* 22-cr-70 (RDM) Denney pleaded guilty to assault (111b) without a plea agreement after deploying pepper spray at officers and assaulting them with a pole, brandishing a baton, and pushing a riot shield into officers an swinging at an officer who had become separated from the police line. He wore full battle attire and repeatedly confronted police officers, beginning at the West Plaza at the metal bike racks making multiple attempts to pull the barricades from the officers and kicking it into officers. Then, he sprayed pepper spray at the officers on multiple occasions and then threw his canister at the officers; he subsequently swung a long pole at another officer, launched a large tube toward other officers. He later joined the rioters at the Lower West Terrace carrying a baton or stick in his hands. Then, he swung his fist at Officer MK, grabbed him in an attempt to pull him down the stairs. After the attack, he lied to the FBI agents about his involvement and deleted information from a social media account. Denney was associated with the Proud Boys and Three Percenters and before January 6 recruited people to his militia group and to participate in the events of January 6 which he expected to be violent. He specifically sought out people who would be willing to engage in violence to join him and solicited donations to pay for

34

protective gear and pepper spray. According to the government, he
sought out battles at BLM Plaza the night before the rally.[34] The
government sought a sentence at the middle of the guideline range of
87 to 108 months (presumably 97 to 98 months) and he was sentenced
to 52 months.[35] Again, a 111(b) conviction, not the lesser 111(a)
conviction.

These cases demonstrate that a sentence of the level requested by the
Government and even the variance suggested by Probation are greater than
necessary under the unique circumstances of this case. Comparing Mr. Mock's
behavior to the panoply of January 6 defendants, Mr. Mock's conduct was
certainly more serious than many who wandered through the Capitol but is far
less serious than those who used weapons they brought or weapons they found to
cause serious bodily injury to police officers. As this Court found, even though he
was convicted of assault, Mr. Mock did not use a dangerous weapon and did not
cause bodily injury to the officers involved. He recognizes the conduct he was
convicted of warrants punishment but submits that the punishment he has
already received is sufficient to deter him and others from any future
misconduct. His conduct is far more similar to those who have received two to
three years in custody than to those who have received 5 years or more. The
pretrial detention that he served was far harsher than that served by

---

[34] ECF 46, Government Sentencing Memorandum
[35] ECF 63, Government Supplemental Sentencing Memorandum

individuals sentenced and allowed to self-surrender to the BOP. Returning him to custody now is not necessary to meet the statutory requirements for sentencing.

## CONCLUSION

Based upon the foregoing, Mr. Mock respectfully requests that the Court sentence him to time-served with a period of supervised release to give him the opportunity to demonstrate that the transformation he has achieved is real and lasting.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____  ____/s/_____
Michelle Peterson
Chief Asst Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500